**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 27, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 05-70006

)))))))))))))))))))))))))))

DERRICK SEAN O'BRIEN,

Petitioner–Appellant,

vs.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas
(02-CV-1865)

---

Before JONES, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:[*]

Petitioner Derrick Sean O'Brien was convicted in Texas state court of capital murder and sentenced to death. Subsequently, O'Brien filed a petition for habeas corpus relief in federal district court, which denied the petition and declined to issue a certificate of appealability ("COA") on any issue. O'Brien now asks this court to grant a COA pursuant to 28 U.S.C. § 2253(c). For the reasons that follow, we DENY the COA request.

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

A summary of the facts as recounted by the district court will suffice:

On the night of June 24, 1993, eighteen-year-old O'Brien participated in the initiation of Raul Omar Villareal into a gang called the Blacks and Whites. Four other gang members, Peter Cantu, Roman Sandoval, Joe Medellin, and Efrain Perez, were present at the initiation, as were Frank Sandoval and Vernancio Medellin, brothers of two of the gang members. The initiation consisted of Villareal fighting each of the other gang members for several minutes. Following this ritual, the gang members drank beer.

At about 11:30 p.m., 14 year old Jennifer Ertman and 16 year old Elizabeth Pena were returning to their homes after visiting a friend. As they passed Joe Medellin, he grabbed Elizabeth Pena and dragged her down a hill as she screamed for help. Jennifer Ertman ran back to help Elizabeth Pena, but Joe Medellin grabbed her and dragged her down the hill as well. Peter Cantu forced Jennifer Ertman to perform oral sex on him and O'Brien raped both girls. The gang rape continued for more than an hour. O'Brien and other members of the gang later boasted that they gang-raped both girls. The girls's bodies were found on June 28, 1993. They were close to each other, and were both in an advanced state of decomposition.

Joe Cantu, Peter Cantu's brother, testified that he received

a call from O'Brien after the murders. O'Brien admitted raping and killing the girls, and he also expressed concern that the girls might still be alive and that the gang left evidence, including beer bottles with fingerprints, at the crime scene. Both Roman Sandoval and Vernancio Medellin testified that the gang had no formal leader, and O'Brien acted voluntarily throughout the rape and murders of the two girls.

O'Brien, Peter Cantu, Efrain Perez, Jose and Vernancio Medellin, and Raul Villareal were arrested on June 29, 1993. When police knocked on O'Brien's door and announced their presence, O'Brien attempted to flee out the back door. He was arrested by officers waiting in back. Houston Police Officer Todd Miller read O'Brien his rights and advised him that he was under arrest for capital murder. O'Brien replied that he knew it was about the two girls who were killed. O'Brien also said he wanted to make a statement. The police then took O'Brien to the police station where he was again informed of his rights and was brought before a magistrate, who again informed O'Brien of his rights. O'Brien subsequently informed police that he gave his belt to Jose Medellin, who used it to strangle one of the girls. At Medellin's instruction, O'Brien grabbed one end of the belt and helped strangle the victim. They pulled so hard that one end of the belt broke off. O'Brien consented to a search of his apartment, and the police found the belt.

Dr. Marilyn Murr of the Harris County Medical Examiner's

3

Office testified that the bodies were badly decomposed and covered with maggots. Most of the soft tissue on Jennifer Ertman's head and the external portion of her vagina was eaten by maggots, indicating that there was trauma, hemorrhaging and bleeding. Autopsy photographs showed the differences in decomposition between those areas that suffered trauma and those that did not, such as Jennifer Ertman's legs, chest, and abdomen. Dr. Murr explained that maggots and bacteria are attracted to blood, and these cause decomposition. Strangulation would cause blood to accumulate in the head area, and cause hemorrhaging in the eyes and mouth, because the pressure on the blood vessels in the neck prevents blood from draining from the head. Dr. Murr concluded that Jennifer Ertman died from trauma to the neck which could include strangulation. Due to the state of decomposition, she could not tell what was used to strangle Jennifer Ertman, but the evidence was consistent with a belt or hands being used. Jennifer Ertman also had three fractured ribs.

Elizabeth Pena's body was similarly decomposed. Several teeth were missing, and one tooth was fractured. Dr. Murr concluded from this that Elizabeth Pena was punched or kicked in the mouth. Dr. Murr concluded that Elizabeth Pena, too, died of trauma to the neck consistent with strangulation. The jury found O'Brien guilty of capital murder for the murder of Jennifer Ertman.

Joyce Jones testified during the penalty phase of the trial.

4

Jones is a teacher at a Houston school for children with behavioral problems. She taught O'Brien in 1987-1988. O'Brien fought with other children and sometimes had to be restrained. Jones described O'Brien as "very aggressive." On one occasion, O'Brien broke another child's jaw. She was not surprised when she heard about O'Brien's involvement in the murders of Jennifer Ertman and Elizabeth Pena.

Raymond Earl Ray testified that he worked as a security guard at K-Mart in 1989. He arrested O'Brien for shoplifting a pellet pistol. A security guard at a Houston public school testified that she once saw O'Brien brandish a handgun at another school security guard. O'Brien threatened to kill the other guard and fired the gun into the air. On another occasion, O'Brien brought a toy gun to school. On a third occasion, security guards received a report that O'Brien had a gun, but no gun was found. O'Brien also bragged about stealing cars, consumed alcohol on the school bus, and once jumped out the bus emergency door with six other students when there was no emergency.

Houston Police Office Timothy Sutton testified that he witnessed O'Brien and Peter Cantu punch, kick, and drag another man at Burger King restaurant about three months before the murder. O'Brien and Cantu were charged with simple assault.

Gregory Ristivo testified that he engaged in criminal activity with O'Brien including stealing cars and stealing

5

jackets and shoes from people. He estimated that he and O'Brien stole between 25 and 50 cars. They would then drive the cars, vandalize them, and sometimes play bumper cars with two stolen cars. Once, O'Brien tried to steal a gun from a car. O'Brien also used a gun to shoot at lights and stop signs while joy riding with Ristivo. Sometimes, O'Brien and Peter Cantu would start fights with random people. O'Brien once grabbed a person at a mall, threw him against a wall, and stole his shoes. This theft occurred at mid-day with other shoppers around. O'Brien intimidated another student at his school into giving O'Brien his Nike shoes. Ristivo also saw O'Brien hit a teacher with a piece of wood, and O'Brien bragged about stabbing someone with a screwdriver while breaking into a car. Ristivo and O'Brien burglarized Ristivo's father's house.

Houston Police Officer Jones testified that he arrested O'Brien for stealing a car. When Officer Jones came upon the scene, O'Brien was fighting with two wrecker drivers. After Officer Jones arrested O'Brien and placed him in the police car, O'Brien continued to yell at the wrecker drivers, threatening to kill them.

Christopher Rodriguez testified that he knew O'Brien from his neighborhood. O'Brien bragged about being a member of the Crips gang and wore Crips colors. O'Brien often bragged about robbing people.

Dr. Stanley Smoote, a psychologist with the Houston

Independent School District, testified that, based on O'Brien's records, O'Brien has conduct disorder. This disorder includes physical aggression toward others.

Officer Mike Knox of the Houston Police West Side Gang Unit testified that O'Brien has tattoos that appear to be gang symbols. Based on the tattoos, Officer Knox concluded that O'Brien was a member of the Folk Nation, a group espousing "the promot[ion] of the black race" and engaging in criminal activity.

Leslie William Morgan was housed on the same floor as O'Brien at the Harris County Jail. Morgan testified that O'Brien denied involvement in the Ertman-Pena murders for the first six months he was in jail, but changed his story when other inmates began taunting him after some news stories came out about the case. According to Morgan, O'Brien then said, "That they were nothing but just whores anyway and that [the] pussy was real good."

O'Brien was also implicated in another murder. On January 4, 1993, Houston Police found the dead body of Patricia Lopez in a park. She was nude from the waist down. Police found a broken belt a few feet from the body, and five empty beer cans, cigarette butts and other items in the area. Patricia Lopez' shirt was unbuttoned and heavily blood stained; it had three holes in the back. Her jacket also had three holes in it, and her bra was cut. There was a stab wound and a cutting wound on her neck, a stab wound on the abdomen, and three stab wounds on

7

the back.  Several of the stab wounds could have been fatal. There was no evidence of strangulation, and no evidence of sexual intercourse. No one was charged with this homicide, but one of the fingerprints lifted from the crime scene evidence belonged to O'Brien.  Jose Martin Medellin, the brother of Jose and Vemancio Medellin, testified that Peter Cantu told him that O'Brien admitted trying to rape the victim.  He was unable to do so and killed her. O'Brien was present when Cantu made his statement, and O'Brien agreed with the statement.

Glenn Hanka testified for the defense.  He is a sergeant with the Harris County Sheriff's department, and was the custodian of records for the Detention Bureau of Inmate Affairs. Hanka testified that there was no record of O'Brien having any disciplinary problems while in jail.  The defense called no other witnesses.

## II

O'Brien was arrested on June 29, 1993 and charged with capital murder.  His trial began on April 5, 1994, and the jury returned a guilty verdict on April 7, 1994.  Sentencing proceedings took place on April 9, 1994, and based on the jury's answers to special issues, O'Brien was sentenced to death.  The Texas Court of Criminal Appeals affirmed his conviction and sentence in an unpublished opinion.  *O'Brien v. State*, No. 71,859 (Tex. Crim. App. May 15, 1996). O'Brien pursued a petition for

8

writ of certiorari to the Supreme Court, which was denied. *O'Brien v. Texas*, 519 U.S. 1094 (1997). Subsequently, O'Brien timely filed a state writ of habeas corpus. The state trial court adopted the State's proposed findings of fact and conclusions of law, and recommended that the writ be denied. The Texas Court of Criminal Appeals denied habeas relief on February 6, 2002. *Ex parte O'Brien*, No. 51,264-01 (Tex. Crim. App. Feb. 6, 2002).

O'Brien then timely filed this federal habeas petition. The district court denied all claims for habeas relief and, *sua sponte,* denied O'Brien a COA on any claim. *O'Brien v. Dretke*, No. H-02-1865, slip op. at 47-49 (S.D. Tex. Jan. 14, 2005).

                              III

O'Brien filed his petition for writ of habeas corpus in district court after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), pursuant to 28 U.S.C. § 2254.[1] AEDPA, therefore, governs this petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Hughes v. Dretke*, 412 F.3d 582, 588 (5th Cir. 2005).

Under AEDPA, a petitioner must obtain a COA before he can appeal a district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)("Until

---

[1] AEDPA became effective on April 24, 1996. *See Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

a COA has been issued[,] federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). We will grant a COA if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). More specifically, we will issue a COA if the district court's application of AEDPA to petitioner's constitutional claims was debatable among reasonable jurists. *Miller-El*, 537 U.S. at 336. "The question is the debatability of the underlying constitutional claim." *Miller-El*, 537 U.S. at 342. "Because the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

In deciding whether to grant a COA, we recognize that section 2254(d) of AEDPA imposes a deferential standard of review on a federal habeas court with respect to claims adjudicated on the merits in state court. *Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir. 2005). A federal court cannot grant habeas relief unless the state court adjudication of that claim either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceeding."  28 U.S.C. § 2254(d); *see Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Brown*, 419 F.3d at 371.  O'Brien seeks appellate review on four grounds: (1) a Sixth Amendment ineffective assistance of counsel claim, (2) an Eighth Amendment claim regarding the jury's ability to consider mitigating evidence, (3) a First Amendment claim relating to O'Brien's gang affiliation, and (4) a due process claim under *Simmons v. South Carolina*, 512 U.S. 154 (1994).

*A. Would reasonable jurists find it debatable that O'Brien received effective assistance of counsel?*

O'Brien seeks a COA because, according to O'Brien, reasonable jurists could debate that his Sixth Amendment right to the effective assistance of counsel has not been violated. *Strickland v. Washington*[2] governs ineffective assistance of counsel claims.  *See Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).  In order to establish a violation of the Sixth Amendment right to counsel, a petitioner must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced his defense.  466 U.S. at 687-88.  Counsel's performance is deficient only when his "representation [falls] below an objective standard of reasonableness."  *Id.*  We measure reasonableness against prevailing professional norms, viewed under the totality of the circumstances.  *Id.* at 688.  "Judicial

---

[2] 466 U.S. 668 (1984).

11

scrutiny of counsel's performance is highly deferential. . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.

O'Brien argues that a COA should issue because reasonable jurists could debate that his trial counsel's failure to adduce only the most perfunctory mitigation evidence did not constitute ineffective assistance of counsel.  During the punishment phase of O'Brien's trial, defense counsel presented only one witness: a records custodian who testified that there were no disciplinary actions taken against O'Brien during his incarceration at the Harris County Jail.  O'Brien maintains that reasonable jurists could debate the district court's conclusion that his counsel was not ineffective for failing to discover and present any additional mitigating evidence.

## 1. Mental Health Evidence

O'Brien first contends this court should grant a COA because reasonable jurists could debate that his counsel's failure to pursue potentially mitigating mental health evidence did not constitute ineffective assistance of counsel. O'Brien's counsel retained a clinical psychologist, Dr. Jerome Brown, a psychiatrist, Dr. Roy Aruffo, and a clinical social worker, Ann Estus, to evaluate O'Brien. O'Brien contends that his counsel was in possession of their psychological reports, which were not presented to the jury during sentencing, that suggested a long history of abuse and attendant psychological problems and allegedly would have been beneficial to O'Brien's case. O'Brien points to a list of factors, identified in Dr. Aruffo's psychiatric evaluation, as having important psychological significance: (1) O'Brien's mother's difficulties with men at the time of O'Brien's birth; (2) early failures in establishing a mother-infant bond; (3) asthma at an early age; (4) attachment to a grandmother who proved to be over-indulgent and had difficulties in setting boundaries; (5) having been treated harshly in the formative years, by two jealous men—one married to his mother and one married to his grandmother; and (6) becoming much too deeply involved in one gang so that his behavior was controlled externally. However, O'Brien's counsel chose not to call Dr. Aruffo, or any of these mental health experts, to

13

testify.

Nevertheless, reasonable jurists would not disagree that O'Brien's counsel's decision regarding the testimony of Drs. Brown and Aruffo was reasonable under the circumstances. Dr. Brown's psychological report was unfavorable to O'Brien, concluding that "[a]lmost all of the clinical scales [were] elevated to pathological levels." Dr. Brown stated in his report:

> [I]t is my belief that the information obtained would be more harmful to Mr. O'Brien in the long run than helpful. . . . Much of his personality development and the documented problem behaviors he has exhibited for a number of years reveal him to be essentially anti-social in basic personality characteristics and as able to at least tolerate, if not participate in, violent and poorly planned criminal activities such as the crime for which he is now being tried. As you know, if I testify in court my results will be available for scrutiny and use by the prosecution. . . . I would not recommend that I be asked to testify on his behalf in the punishment phase.

In addition, Dr. Aruffo noted that O'Brien's "perception of reality is greatly colored by defects in his personality." Although Dr. Aruffo observed in his prognosis that "[t]here is a possibility that in a few years [O'Brien] would be more adult like and inhibited and restrained," he diagnosed O'Brien with Antisocial Personality Disorder and stated, "There is little or no indication that Mr. O'Brien wants or needs to make amends when he has transgressed conventional morality. People with a mature conscience feel good about themselves when they obey the commands of their conscience. This young man feels increased self esteem

14

when he offends society." Finally, Ann Estus, the clinical social worker, concluded that due to O'Brien's "lack of judgment or impulse control and his inability to empathize with his victims, it is likely he would, in a new community, once again seek out an anti-social peer group."

The district court concluded that the state court's refusal to grant habeas relief based on this evidence was not unreasonable: counsel made a strategic decision not to call these mental health witnesses, considering their negative observations of O'Brien's character. O'Brien's trial counsel recognized that the mental health experts' testimony would be more harmful to the defense than helpful, particularly given that counsel would have had to make the expert reports available to the prosecution if these witnesses had been called to testify.[3]

### 2. Ella Jones

O'Brien contends this court should grant a COA because reasonable jurists could debate that counsel's failure to call his mother, Ella Jones, to testify on his behalf did not constitute ineffective assistance of counsel. Ms. Jones submitted statements to the state habeas court and federal

---

[3] The petitioner also indicates that although counsel investigated O'Brien's mental health, the investigation was not conducted in a timely fashion. However, the record shows that the mental health evaluations and reports were completed prior to the commencement of O'Brien's trial. In addition, counsel conferred with the mental health experts who expressed opinions that counsel deemed detrimental to O'Brien.

district court,[4] expressing concern that she was not given the opportunity to speak on her son's behalf or say anything to contradict the other witnesses. In her statements, Ms. Jones explains that her son had experienced some difficulties in school as a result of alleged sexual advances by a male teacher. She describes her son as a young man headed in a positive direction.

However, the record reveals that counsel spoke with Ms. Jones and made a strategic decision not to call her as a witness. During Ms. Jones's interview with counsel, Ms. Jones stated: she had attempted to take O'Brien to counseling, but that he wouldn't attend faithfully; she was not surprised that the incidents leading up to O'Brien's prosecution had occurred; and she had warned O'Brien on numerous occasions about his conduct and the people with whom he was associating. In addition, O'Brien told his counsel that he did not want his mother to testify because he did not want to subject her to cross-examination and other harassment by the prosecution. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Further, "in evaluating strategic choices of trial counsel, we must give great deference to choices which are made

---

[4] With respect to Ms. Jones' affidavits, we only consider the factual allegations that were presented to the state habeas court. *See Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000).

16

under the explicit direction of the client." *U.S. v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).

The state habeas court found counsel's explanation as to why counsel did not call Ms. Jones to testify credible. State court findings of fact are presumed to be correct, unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Valdez v. Cockrell*, 274 F.3d 941, 947-48 (5th Cir. 2001); *see also Pondexter v. Dretke*, 346 F.3d 142, 149 (5th Cir. 2003).

Consequently, the district court agreed with the state habeas court: counsel made a professional judgment that Ms. Jones would not be a favorable witness. The district court explained that "[w]hile hindsight might suggest that counsel should have called [Ms.] Jones, the tactic was not so ill chosen that it permeated the entire trial with obvious unfairness." *O'Brien v. Dretke*, No. H-02-1865, slip op. at 13 (S.D. Tex. Jan. 14, 2005)(internal quotations omitted). Reasonable jurists would not find this debatable.

### 3. James Fortson

O'Brien next argues this court should grant a COA because reasonable jurists could debate that defense counsel's failure to call James Fortson, O'Brien's step-grandfather, to testify during sentencing did not constitute ineffective assistance of counsel. O'Brien contends that evidence of Mr. Fortson's mistreatment of him could have provided the foundation for a meaningful

17

mitigation case. O'Brien lived with Mr. Fortson, and O'Brien's psychological evaluations indicate that Mr. Fortson was abusive and intentionally cruel toward O'Brien when he was child.

However, the district court found that counsel's decision not to call Mr. Fortson was a reasonable strategic decision. Dr. Aruffo's psychiatric evaluation states that Mr. Fortson was cruel to O'Brien because he was "jealous of the boy." Given Mr. Fortson's reported hostile feelings toward O'Brien, counsel concluded that Mr. Fortson would not be a favorable witness to the defense.

Mr. Fortson's affidavit, that he submitted during the state habeas proceeding, states that he was never contacted by defense counsel regarding O'Brien's childhood and that he would have liked to discuss his role in O'Brien's life. However, Mr. Fortson's affidavit does not indicate what the nature of his testimony would have been. Complaints based upon uncalled witnesses are disfavored because "speculations as to what these witnesses would have testified is too uncertain." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *see Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002)("[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."). Here, such uncertainty precludes the debatability of a finding of prejudice.

## 4. Other Witnesses

O'Brien contends this court should grant a COA because reasonable jurists could debate that counsel's failure to identify potentially mitigating witnesses did not constitute ineffective assistance of counsel. O'Brien submits affidavits from Sheila and Lois Powers and Eddie and Gwendolyn Walker.[5] Sheila and Lois Powers are family friends of O'Brien and the Walkers are O'Brien's aunt and uncle. Their statements indicate that O'Brien is a soft-spoken, respectful young man. The affidavits also suggest O'Brien felt that he was not taken seriously after his school disregarded his allegations of sexual advances by a male teacher. Eddie Walker characterizes this incident as the source of O'Brien's difficulties. All four declarants state that they would have testified on O'Brien's behalf.

---

[5] O'Brien submitted these affidavits, for the first time, to the district court on federal habeas review. Section 2254(b)(1)(A) of AEDPA states that "a writ of habeas corpus ... shall not be granted unless it appears that-- the applicant has exhausted the remedies available in the courts of the State." However, we will consider these affidavits to the extent they do not present material evidentiary support to the federal court that was not presented to the state court. *See Dowthitt*, 230 F.3d at 745-46. In his state habeas petition, O'Brien argued that his trial counsel failed to conduct a meaningful investigation into potential mitigating testimony. He further stated that, had counsel discovered available potential witnesses, the testimony would have included O'Brien's family history, character, background, and evidence related to attempted sexual abuse by a teacher.

Despite counsel's failure to discover these potential witnesses, reasonable jurists could not disagree that counsel's investigation into O'Brien's background was reasonable. *See Williams v. Maggio*, 679 F.2d 381, 393 (5th Cir. 1982) ("Petitioner's final argument charges counsel with failure to conduct a thorough pre-trial investigation. . . . This challenge to counsel's performance attempts to do precisely that which is barred by this Court; it invites us to question counsel's trial strategy and judge his performance incompetent if it was not errorless."); *see also Burger v. Kemp*, 483 U.S. 776, 794 (1987) ("[C]ounsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment."). Counsel asked O'Brien to identify potential mitigation witnesses, interviewed several of O'Brien's family members and friends, and retained mental health experts. Based on counsel's findings, he determined that none of these potential witnesses would be favorable to the defense. When counsel speaks with a great number of mitigation witnesses, but reasonably determines those witnesses would do more harm than good, he adequately investigates possible mitigating evidence. *See Boyle v. Johnson*, 93 F.3d 180, 188 n.18 (5th Cir. 1996).

The district court's rulings regarding O'Brien's ineffective assistance of counsel claim are not debatable among jurists of

20

reason.   A COA may not issue as to this claim.

*B. Would reasonable jurists find it debatable that the jury was unhindered in its ability to consider mitigating evidence during the punishment phase of trial?*

O'Brien contends this court should grant a COA because reasonable jurists could debate that his Eighth and Fourteenth Amendment rights were not violated.  According to O'Brien, the jury was unable to consider all of the mitigating evidence presented, in violation of those rights. Under *Penry v. Johnson*, "the jury [must] be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence."  532 U.S. 782, 797 (2001) (internal citations omitted).  O'Brien points out that the prosecutor told the jury there must be a connection between mitigating evidence and the charged crime.  He concedes that the trial court gave the proper statutory charge, but argues that its effect was negated by deliberate, constant limitations imposed by the prosecutor.

During voir dire examination, the prosecutor told some of the prospective jurors that the only relevant mitigation evidence was evidence connected to the crime itself.  For example, the prosecutor stated:

> And you might consider whether or not those things in his background or in the case background are connected to the actual killing.  For example, if there's something in a defendant's background that you didn't think was even connected to why he did what he did, then you might consider that as not sufficiently mitigating.

21

In addition, during direct examination at the punishment phase, a witness testified that O'Brien was learning disabled in mathematics. The prosecutor asked whether this disability could be connected to the crime as an excuse. Finally, in his closing argument, the prosecutor reiterated that a nexus between possibly mitigating evidence and the crime was required;[6] he concluded that "there's not anything at all [the jury] heard from any witness that is mitigating." O'Brien contends that, due to the prosecutor's statements throughout the trial, the jury was unable to consider his youth[7] and his behavior while in the Harris County Jail.[8]

---

[6] During closing argument at punishment, the prosecutor stated:

> Then you move on to [Special Issue] No. 3, then you look at the Charge. And it tells you to ask yourself if there's anything mitigating. And we talked about what does mitigating mean. . . . What, if anything, is mitigating about him that you heard? The only thing that I can possibly think of is that the guy's learning disabled in arithmetic, he can't add. . . . Well, does that have anything to do with raping and killing these two girls? Can that have possibly somehow be connected as an excuse for what he's done to them?

> [Dr. Smoote] told you no. You didn't need a psychiatrist or psychologist to tell you that. It doesn't take a rocket scientist to figure out if you can't add that doesn't give you the right to go out and kill . . . other people. So there's not anything at all that you heard from any witness that is mitigating.

[7] O'Brien was eighteen years old at the time of the murder. Youth is constitutionally relevant to the sentencing determination. *See Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).

[8] A good disciplinary record during incarceration is a relevant mitigating circumstance. *See Skipper v. South Carolina*,

22

Prior to the Supreme Court's decision in *Tennard v. Dretke*,[9] we required a petitioner to show that mitigating evidence was relevant by demonstrating that he had a uniquely severe permanent handicap acquired through no fault of his own, and there was a nexus between the offense and the petitioner's severe permanent condition. *See Davis v. Scott*, 51 F.3d 457, 460-61 (5th Cir. 1995), *overruled in part by Tennard*, 542 U.S. at 283-84; *Cole v. Dretke*, 418 F.3d 494, 499 (5th Cir. 2005). The *Tennard* Court, however, explicitly held our "uniquely severe permanent handicap" and "nexus" tests incorrect and rejected them. *Tennard*, 542 U.S. at 289. Instead, the Supreme Court clarified its "low threshold for relevance" of mitigating evidence stating, "[A] State cannot bar the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death." *Id.* at 2570 (internal quotations omitted).

Although O'Brien's trial took place prior to *Tennard*, the trial court's jury instructions were constitutional, reflecting the proper statutory charge. In *Lockett v. Ohio*, a plurality of the Supreme Court held that the "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis

476 U.S. 1, 7 (1986).

[9] 542 U.S. 274 (2004).

23

for a sentence less than death."  438 U.S. 586, 604 (1978).

During the punishment phase of O'Brien's trial, the jury was

required to respond to the following special issue, in accordance

with Texas's current capital sentencing scheme:

> Taking into consideration all of the evidence, including evidence of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[10]

*See* TEX. CRIM. PROC. CODE ANN. art. 37.071(2)(e)(1).

The jury was further instructed that "the term 'mitigating

evidence' or 'mitigating circumstances' means evidence that a

juror might regard as reducing the defendant's moral

blameworthiness."  In addition, the judge instructed the jury

that "[a] mitigating circumstance may include, but is not limited

to, any aspect of the defendant's character, background, record,

emotional instability, intelligence or circumstances of the crime

which you believe could make a death sentence inappropriate in

---

[10] This was the third of three special issues presented to the jury.  The first special issue inquired, "Is there a probability that the defendant, Derrick Sean Obrien [sic] would commit criminal acts of violence that would constitute a continuing threat to society?"  The jury answered this first question in the affirmative. The second special issued asked:
> Do you find from the evidence beyond a reasonable doubt that Derrick Sean Obrien [sic], the defendant himself, actually caused the death of Jennifer Ertman, the deceased, on the occasion in question, or if he did not actually cause Jennifer Ertman's death, that he intended to kill Jennifer Ertman or another, or that he anticipated that a human like would be taken?
The jury also answered this question in the affirmative.

24

this case."  In light of *Tennard*, these instructions "do not unconstitutionally preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.), *cert. denied*, 534 U.S. 945 (2001)(internal quotations omitted); *see Cole v. Dretke*, 418 F.3d 494, 504 & n.44 (5th Cir. 2005)(indicating that Texas's current capital sentencing scheme is constitutional after *Tennard* because it includes a "catchall instruction on mitigating evidence").  In the present case, the trial court's instructions taken alone, allowed the jury to consider and give effect to O'Brien's youth and post-arrest behavior.

However, the context of the proceedings is relevant in determining whether the jury could reasonably have given effect to the mitigating evidence.  *Boyde v. California*, 494 U.S. 370, 383 (1990); *Penry*, 532 U.S. at 800-02 ("[W]e will approach jury instructions in the same way a jury would–with a commonsense understanding of the instructions in the light of all that has taken place at trial.") (internal quotations omitted); *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994)("[I]n some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury

25

system cannot be ignored.") (internal quotations omitted).  In that vein, O'Brien argues that the prosecutor's comments prejudiced the jury such that it was unable to give meaningful effect to any of the mitigating evidence presented.  Indeed, the district court recognized that the prosecutor's comments seemed intended to restrict the jury's consideration of mitigating evidence.  Although a "crucial assumption underlying the system of trial by jury is that parties will follow instructions given them by the trial judge," *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983); *see Penry*, 532 U.S. at 799, prosecutorial misrepresentations may have a decisive effect on a jury.  *Boyde*, 494 U.S. at 384-85; *see Penry*, 532 U.S. at 799-800 (finding it logically and ethically impossible for the jury to follow the jury instructions).  In an instance where prosecutorial statements allegedly influence a jury's interpretation of the statutory charge, the proper inquiry is whether there is a reasonable likelihood that the jury has applied the instructions in a way that prevents it from considering constitutionally relevant evidence.  *Boyde*, 532 U.S. at 380.  This is particularly true in capital cases where there is "a strong policy in favor of accurate determination of the appropriate sentence." *Id.*

    In this case, reasonable jurists would not debate the effectiveness of the trial court's statutory charge.  In context, rather than arguing that the jury was precluded from considering

these factors as mitigating circumstances, the prosecutor's statements could have been interpreted to mean that the jury should not consider the factors mitigating in O'Brien's case. *See Jones v. Butler*, 864 F.2d 348, 360 (5th Cir. 1988). Even if the jury understood the prosecutor's statements to mean the former, we do not attribute to a prosecutor's comments the same force as instructions of the court. *Boyde*, 494 U.S. at 384-85. Reasonable jurists would not disagree that the prosecutor's statements were not so pervasive as to overcome the presumption that jurors follow their instructions. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Hopkins*, 916 F.2d 207, 218 (5th Cir. 1990).

There is not a reasonable likelihood that the jury felt precluded from considering constitutionally relevant evidence. Reasonable jurists would not disagree as to the district court's resolution and a COA may not issue as to this claim.

*C. Would reasonable jurists find it debatable that introduction of evidence during the punishment phase of trial, concerning O'Brien's gang affiliation, was harmless?*

O'Brien contends this court should grant a COA because reasonable jurists could debate that his First Amendment right to freedom of association was not violated when, during sentencing, the prosecution called Police Officer Knox to testify about the significance of O'Brien's tattoos. Officer Knox testified that one of O'Brien's tattoos indicated that O'Brien may be a member

27

of a gang, and that gangs are generally involved in criminal activity.  O'Brien relies on *Dawson v. Delaware*,[11] to argue that the introduction of evidence of his gang affiliation violated his constitutional rights because his gang affiliation had no bearing on the issue being tried.

Finding any possible error harmless, the district court concluded that the state habeas decision denying relief was not unreasonable.[12]  The district court first noted that O'Brien's case fell somewhere between *Dawson* and *Fuller v. Johnson*.[13]  The district court observed that a prosecutor can validly introduce evidence of gang affiliation if it is relevant to whether the defendant is a future danger.  In O'Brien's case, the state introduced evidence that O'Brien belonged to a gang that was involved in criminal activity.

Without deciding if the trial court erred by admitting

---

[11] 503 U.S. 159 (1992) (stating that where both parties stipulated to the defendant's membership in the Aryan Brotherhood prison gang, but the prosecution offered no evidence of the gang's violent tendencies relevant to sentencing, the use of that associational evidence violated the defendant's First Amendment rights).

[12] More specifically, the district court stated that "[t]his case falls somewhere between *Dawson* and *Fuller*. . . . While the facts of this case place it in a somewhat gray area, any error in admitting this testimony was harmless." *O'Brien v. Dretke*, No. H-02-1865, slip op. at 27 (S.D. Tex. Jan. 14, 2005).

[13] 114 F.3d 491 (5th Cir. 1997)(holding that where the State introduced evidence that the defendant was a member of a gang that had committed unlawful or violent acts the defendant's First Amendment rights had not been violated).

Officer Knox's testimony, the district court held that any error in admitting the testimony was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)("[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless.") (internal quotations omitted). We find that reasonable jurists would not disagree. As the district court explained, O'Brien was convicted of an exceedingly brutal rape-murder of a teenage girl. The jury heard a large amount of evidence establishing O'Brien's long history of criminality and violence. Other witnesses, in addition to Officer Knox, testified regarding O'Brien's gang membership; Chris Rodriguez and Joe Cantu both testified as to O'Brien's affiliation with gangs. Furthermore, testimony presented during the guilt-innocence phase of trial established that the rape and murder of Jennifer Ertman occurred following the initiation of a new member into O'Brien's gang. A COA may not issue as to this claim.

*D. Would reasonable jurists find it debatable that O'Brien was not denied due process under Simmons v. South Carolina?*

O'Brien argues this court should grant a COA because reasonable jurists could debate that he was not denied due process when the trial court refused to allow the jury to hear that, if sentenced to life imprisonment, he would be ineligible for parole for 35 years. In *Simmons*, the Supreme Court held that

29

when "the alternative sentence to death is life without parole . . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court." *Simmons*, 512 U.S. at 169. O'Brien concedes that, if sentenced to life imprisonment, he would have been eligible for parole after 35 years. However, O'Brien argues that *Simmons* applies to his case because, at the time of his conviction, Texas was a *de facto* life without parole state.[14] However, "*Simmons* applies only to instances where, *as a legal matter*, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000)(emphasis added). We have repeatedly rejected claims that *Simmons* extends to instances other than where, as a legal matter, there is no possibility of parole. *See Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[T]he Fifth Circuit has repeatedly refused to extend the rule in *Simmons* beyond those situations in which a capital murder defendant is statutorily ineligible for parole."). O'Brien does not fall within the scope of *Simmons*.[15] Reasonable

---

[14] In 2005, the Texas legislature amended the Texas Code of Criminal Procedure, formally creating life without parole. *See* TEX. CRIM. PROC. CODE ANN. art. 37.071(2)(e)(2).

[15] The district court also held that O'Brien was barred from any extension of *Simmons* under *Teague v. Lane*, 489 U.S. 288 (1989).

30

jurists would not disagree with the district court's resolution of this claim.  We will not issue a COA.

                              IV

We find that jurists of reason could not disagree with district court's resolution of O'Brien's constitutional claims. We DENY a COA on all claims.