United States Court of Appeals
Fifth Circuit

**F I L E D**

May 11, 2006

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

Nº 05-70014

_____

DONELL O'KEITH JACKSON,

Petitioner-Appellant,

VERSUS

DOUG DRETKE,
DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
Nº H-02-CV-2601

_____

Before DAVIS, SMITH, and DENNIS,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited (continued...)

Donell Jackson requests a certificate of appealability ("COA") from the denial of his claim for federal habeas corpus relief under 28 U.S.C. § 2254. We deny a COA as to all but two of Jackson's claims on which a COA is required, because jurists of reason would not

---

*(...continued)
circumstances set forth in 5TH CIR. R. 47.5.4.

find the rejection of them debatable. As for the claim on which we grant a COA, and the claim for which no COA is required, we affirm on the merits.

## I.

Jackson was charged with killing his victim for remuneration. The victim had previously testified before a grand jury in its investigation of Jackson's friend, David Smith. Smith indicated in a taped statement that he did not know Jackson was going to shoot the victim. When the police played Smith's statement for Jackson during interrogation, Jackson allegedly replied that Smith had paid him to commit the murder. Jackson then made a taped confession. To shift the blame, Jackson at trial claimed the police had told him to say that Smith had paid him.

Jackson was convicted by a jury of capital murder. At sentencing, the state introduced evidence of prior offenses, and Jackson presented evidence of a favorable home life and a learning disability. The jury sentenced him to death, finding that he posed a threat of future dangerousness and that the mitigating evidence was inadequate to warrant a life sentence.

The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. Jackson filed a concurrent petition for writ of habeas corpus in the trial court, which entered findings of fact and conclusions of law that were adopted by the Court of Criminal Appeals in an order denying habeas relief.

Jackson filed a federal habeas petition under § 2254, alleging twenty-two points of error. The district court granted summary judgment denying Jackson's claims, and denied *sua sponte* a COA as to each claim. Jackson filed a notice of appeal and request for a COA.

## II.

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which requires, as a jurisdictional prerequisite to appeal, that Jackson obtain a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). A COA will issue if Jackson makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253-(c)(2). The prevailing standard requires Jackson to demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved [by the district court] in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

Although the COA determination requires a threshold inquiry into the merits of a petitioner's claim, it does not involve a full canvassing of the factual or legal bases for relief. *See Miller-El*, 537 U.S. at 336-37. We do not inquire whether Jackson will succeed on appeal, or even whether any reasonable jurist would ultimately grant Jackson's petition. Rather, we ask only whether the federal district court's resolution of Jackson's claims is *debatable* among jurists of reason.[1]

When assessing whether jurists of reason could debate the denial of Jackson's habeas petition, we are mindful of the deferential standard of review the district court must apply under AEDPA. *See Miniel v. Cockrell*,

---

[1] *Miller-El*, 537 U.S. at 338 (stating that "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

339 F.3d 331, 336 (5th Cir. 2003). The district court must defer to the state court's adjudication of a defendant's claims on the merits unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or . . .was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

A state court's decision is "contrary to" clearly established federal law if it reaches a result in direct conflict with Supreme Court precedent, either by drawing a contrary legal conclusion or basing a contrary judgment on materially indistinguishable facts. *Miniel*, 339 F.3d at 337 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court's decision is based on an "unreasonable application" of clearly established federal law if it is "objectively unreasonable." *Id.* Therefore, it is not enough for the reviewing court to believe that the state court applied Supreme Court precedent incorrectly;[2] rather, the application must be outside the range of reasonable judgment permitted by the particular rule.[3]

It is the ultimate legal conclusion reached by the state court, not every step of its reasoning process, that should be tested for unreasonableness. *See Santellan v. Cockrell*, 271

F.3d 190, 193 (5th Cir. 2001). Finally, AEDPA presumes that the state court's factual findings are correct; the defendant has the burden of proving otherwise by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.
Jackson makes eight separate arguments for a COA. We deal with each of these in turn.

### A.
Jackson argues that his confession was involuntary and the product of police misconduct. Specifically, he maintains that, to shift blame to Smith, police told him to say that he received money for the victim's murder; Jackson alleges that discrepancies between the details of his confession and statements made by Smith compel the conclusion that police coerced a confession.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (quoting 3 RUSSELL ON CRIMES 478 (6th ed.)).

As the district court noted, the admissibility of Jackson's confession might be in doubt if the facts he alleges were true. The jury, however, considered the evidence presented by Jackson and the police at trial, and found that no promises were made to Jackson in exchange for his confession. This credibility determination is squarely within the province

---

[2] *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

[3] *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (explaining that "the range of reasonable judgment can depend in part on the nature of the relevant rule . . . . The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.").

of the jury,[4] and AEDPA tells us to presume that this finding is correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Because Jackson did not present any new evidence in his habeas petition that would satisfy this rigorous standard, reasonable jurists could not disagree with the denial of a COA on this issue.

### B.

Jackson contends that the alleged discrepancies between his confession and Smith's statements prove that the confession is false, so there was no evidence to establish that Jackson killed the victim for remuneration. Hence, Jackson maintains that he is actually innocent of capital murder.

A claim of actual innocence based on newly discovered evidence is not cognizable for purposes of federal habeas corpus absent an independent constitutional violation. *Herrera v. Collins*, 954 F.2d 1029, 1034 (5th Cir. 1992), *aff'd*, 506 U.S. 390 (1993). This rule recognizes that the purpose of federal habeas corpus is "to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399. A petitioner may prove actual innocence to overcome a procedural default, allowing a federal habeas court to reach the merits of an otherwise barred constitutional claim. *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

Jackson does not allege actual innocence to remove a procedural bar to a separate constitutional claim. Rather, he submits evidence, consisting of testimonial discrepancies and expert opinion that he may suffer from a learn-ing disability and other psychological problems, to diminish the probative value of his confession. He seeks only to remove the evidentiary basis of the jury's conclusion that he committed capital murder; i.e., murder-for-hire. Because this is a free-standing actual innocence claim, no reasonable jurist could disagree that Jackson failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Therefore, a COA for this claim is denied.

### C.

#### 1.

Jackson urges that the state exercised its peremptory challenges in a racially discriminatory manner, in violation of his Fourteenth Amendment rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). The *Batson* Court held that a defendant must first make a *prima facie* showing that the prosecutor is exercising his strikes based on the prospective juror's race. *See id.* at 96-97.

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging [minority] jurors." *Id.* at 97. If the state is unable to offer a race-neutral explanation, the defendant's sentence should be reversed. *See id.* at 100. If the state advances putatively neutral reasons, the defendant bears the ultimate burden of proving that those reasons are pretextual. *See id.* at 94 n.18.

In *Miller-El*, the Court reversed this court's denial of a COA on a *Batson* claim, finding that it was debatable among jurists of reason whether Miller-El would succeed in his federal habeas case. *Miller-El*, 537 U.S. at 348. The Court noted that deference to the state court is often appropriate for *Batson* claims, because whether the defendant has carried his burden

---

[4] *See United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001).

of proof will often turn on the credibility of the prosecutor exercising the strikes, and "a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." *Id.* at 339. Such deference, however, does not mean that a COA shall never issue; rather, "[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.* at 340.

*Miller-El*, therefore, did not alter the standards for evaluating requests for a COA under AEDPA, nor did it articulate a new test for reviewing *Batson* claims; rather, it spoke only to "the type and quantum of record evidence" needed to establish eligibility for a COA. *Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir. 2005) (describing *Miller-El v. Dretke*, 125 S. Ct. 2317 (2005) ("*Miller-El II*")), *cert. denied*, 126 S. Ct. 1028 (2006).

In *Miller-El*, the Court found a number of circumstances in the record that supported the *Batson* claim. To succeed on a *Batson* claim, however, a petitioner need not submit each type of evidence addressed by *Miller-El*. A petitioner is also not limited to the types of evidence considered by the Court in *Miller-El*. There, the Court found the following factual circumstances persuasive in determining that a COA should issue:

(1) the State used 10 of its 14 peremptory strikes against African-Americans, and only one ultimately served on the jury;

(2) the trial court conducted a *Batson* hearing two years after voir dire, so the court had no occasion to judge the prosecu-

tor's credibility;

(3) the race-neutral reasons provided for striking certain black jurors applied equally well to white jurors who went unchallenged;

(4) the State used disparate questioning for white and black jurors, prefacing its questions to more than half the prospective black jurors with an explicit description of Texas's execution procedures (compared to 6% of whites), and informed 94% of whites of the statutory minimum sentence (compared to 12.5% of blacks);

(5) the State requested a jury shuffle when a predominant number of African-Americans sat at the front of the panel; and

(6) evidence suggested that, historically, a culture of bias against African-American jurors suffused the District Attorney's office, including the formal training of assistant district attorneys on how to exclude minorities from juries.

*Miller-El*, 537 U.S. at 342-47.

To support his *Batson* claim, Jackson presents two types of evidence that are similar to the first and third circumstances examined in *Miller-El*. First, he points out that 5 of the 11 (or 45%) of the peremptory strikes were against black venire members.[5] Second, he

---

[5] Although statistical evidence alone may raise some debate as to whether the prosecution acted with a race-based reason for striking prospective jurors, *Miller-El*, 537 U.S. at 342, Jackson fails to present this court with sufficient statistical information to make that determination. He contends

(continued...)

asserts that some of the race-neutral reasons provided for striking certain black venire members applied equally to white venire members who went unchallenged and were selected for the jury. He also contends that the prosecutor's reasons for striking the five black venire members were pretextual because the proffered reasons did not accurately reflect the voir dire testimony of the members.

The Court in *Miller-El* stated that, when the prosecution's reasons for striking black jurors could apply equally well to white jurors who were ultimately empaneled, "the application of these rationales to the venire might have been selective and based on racial considerations." *Id.* at 343. In particular, the Court noted that similarly-situated white and black potential jurors expressed ambivalence about the death penalty. *Id.*

A COA determination under § 2253(c) requires "an overview of claims in the habeas petition and a general assessment of the merits." *Miller-El*, 537 U.S. at 336. This threshold inquiry, however, "does not require full consideration of the factual or legal bases adduced in support of a claim." *Id.*.

After our threshold inquiry into the merits of Jackson's claim, we conclude that reasonable jurists could debate whether the state's use of peremptory strikes against black venire members was race-based and thus in violation of *Batson*. We therefore grant a COA on this claim. After reviewing the briefs and record in full, however, we deny Jackson's claim for

habeas relief, finding the state habeas court's determinations to be consistent with federal law as established by the Supreme Court.

2.

Jackson objects to the strikes of five black jurors—Maria Brooks, Lee Davis, Myrtle Gibson, Ingrid Poindexter, and Laverne Reid. We consider each of these briefly in turn.

a.

The state indicated it struck Brooks because she stated she would have difficulty deciding that the state had proved future dangerousness;[6] she expressed opposition to the death penalty; she said her religion taught her not to sit in judgment of another person. Though Jackson cites Terry Arnold as an example of a white juror who was empaneled despite expressing similar reservations about sitting in judgment of another,[7] Arnold's res

---

[6] When asked about predicting Jackson's future dangerousness, Brooks stated, "I can't predict the future for anything. We just don't know the future." When pressed further by the state, she responded that "no one can see into the future of an individual."

[7] Arnold's questionnaire stated, "I do not particularly care to stand in judgment of someone else, but if necessary, will do so." The following exchange occurred between the Court and Arnold on this subject:

Q. Do you have any convictions that would prevent you from being able to stand in judgment?

A. Not from a religious standpoint or anything. It's just a personal feeling I have as an individual.

(continued...)

---

[5](...continued)
that 5 of the 11 peremptory strikes were used against black members of the venire, but without other information concerning the composition of the jury pool this statistic has little meaning.

ervations in this respect were less serious than were Brooks's. Arnold also did not express hesitancy about being able to find future dangerousness.

### b.

The state's reason for striking Davis was his apparent opposition to the death penalty and his indication that he would hold the prosecution to an elevated standard in capital cases.[8] Jackson does not compare Davis to an empaneled white juror, but rather argues that Davis's answers suggest he would be able to apply the correct burden of proof fairly in a capital case. Even though Davis softened his statement that he would require proof of guilt to a certainty, the state was entitled to conclude that he might require it to prove guilt by an elevated standard even if that burden were something less than metaphysical certainty.

### c.

The state claims it struck Gibson because she stated she believed that black people were treated unfairly by the criminal justice system, because she thought she might know the defendant personally, and because she was unsure about her feelings on the death penalty.

<hr>

[7](...continued)
Q. Well, and it doesn't have a religious basis . . . . I need for you to have looked inside yourself, whether it's a religious basis or just personal convictions. Do you feel like you would be able to make the decision in a case if you were in that position?

A. I can make a decision, yes, I could.

[8] During voir dire the state asked Davis how he felt about the possibility of serving on a jury in a case involving the death penalty. He replied, "I would have to really believe that a hundred percent, have no doubt that the actual crime was committed by a person for me to . . . render a decision of . . . death in a situation like this. I'd have to be a hundred percent convinced." Later the state again asked Davis about the burden of proof he would require the state to carry in a death penalty case:

Q. Do you feel like if the State didn't prove [the offense] to you a hundred percent or beyond all doubt, that you could find the defendant guilty if you didn't know a hundred percent?

A. I'd have to be convinced—I'd have to be more convinced that the person did commit this. I have to be convinced enough to the point where I don't feel like there is a possibility that the State could have been mistaken or maybe

(continued...)

<hr>

[8](...continued)
there is a possibility that someone else could have done it or—

Q. Is that beyond, I mean, in your mind, any doubt?

A. What's reasonable? What's reasonable to me?

Q. Right. And I guess that's what the question—I mean, what's reasonable to you seems to be a hundred percent.

A. Okay. It may—maybe—maybe a hundred percent is being a little critical, but I have to be—the balance—I have to be convinced in the balance and maybe—maybe a hundred percent—I don't know if you actually mean to give you a percentage, you know, I don't know if that's fair or not. But I have to be thoroughly convinced enough, and that's not—maybe saying a hundred percent is not the right way for me to say that, but I have to be—the balance, I have to be more convinced that they did it than not and I can't really give a percentage on that.

Besides challenging these contentions on the merits, Jackson argues that Gibson's comment about the unfair treatment of black people is substantially similar to white empaneled juror Kevin Chapman's comment that the justice system treats marihuana users unfairly.[9]

d.

As for Poindexter, the state points to strong language[10] in her questionnaire opposing the death penalty and stating that life imprisonment is a worse punishment than death. Jackson again points to Chapman, who initially stated he would hold the state to a higher burden of proof in capital cases but later clarified that he understood that the applicable burden of proof was beyond a reasonable doubt in all cases.[11]

---

[9] We disagree with Jackson's contention that Chapman's statement that marihuana users are treated unfairly in the criminal justice system is equivalent. Therefore, the fact that Chapman ultimately served on the jury despite making such a statement lends no support to Jackson's *Batson* claim. As stated by the federal habeas court, "[t]here is no evidence that the prosecution would not have struck a white juror expressing the same sentiment" as Gibson, and "the selection of Chapman and rejection of Gibson as jurors does not demonstrate any racially motivated action by the State."

[10] In her questionnaire, Poindexter stated that she did not believe in the death penalty and thought it is "the most hideous practice of our time." She also stated that "[w]e can't call ourselves civilized as long as we have capital punishment." These statements alone are justification for the state to want Poindexter excused from the jury, even though she later said she would have no problem imposing the death penalty in certain cases.

[11] The state pressed Chapman on raising the
(continued...)

e.

Reid's testimony suggested that she thought that to prove future dangerousness, the state would have to demonstrate that the defendant would commit murder in the future.[12] She also expressed confusion over the special issues. Jackson argues that Reid equivocated in her testimony, that the state rushed Reid through her voir dire, and that empaneled juror Brian Summers indicated similar confusion on the special issues.[13]

---

[11](...continued)
burden of proof: "So—and you can correct if I'm wrong—in a capital case you would want to raise the burden of proof, raise the threshold of what a reasonable doubt is?" Chapman responded, "I said something similar to that, but that's not what I was saying. I can't remember exactly my words. I opened up before I said that, it's a reasonable doubt no matter what kind of case you're doing." We agree with the district court that Chapman made it plain that he did not intend to say that he would hold the state to a higher burden of proof.

[12] When asked whether she thought it was possible to predict whether someone will be dangerous in the future, Reid stated, "No, I don't think that's predictable." She also said that "the State could prove it if that person actually did commit—did do it, did repeat it. But if the person didn't repeat it, then I don't see how the State could prove it."

[13] After being asked a lengthy question by the state concerning Special Issue No. 2, Summers asked, "Do I—could you take some of the words out in that and condense it?" Jackson contends that this statement indicates Summers's confusion with Issue No. 2. But, after the state condensed its question and asked, "Do you think that the system that Texas has in place right now is an appropriate way, in your own mind, to determine who should get the death penalty and who should get life in prison?", Summers responded, "Yes, I do."
(continued...)

Jackson also contends that the prosecutor's reason for striking Reid based on the fact that she did not know that murder-for-hire was a capital offense, was similar to statements made by empaneled juror Chapman. Given the strong statements made by Reid concerning her reluctance to find future dangerousness, the state certainly had a valid race-neutral reason to use a peremptory challenge for Reid.

3.

AEDPA requires that the trial court's decision be an "unreasonable application" of clearly established federal law or based on an "unreasonable determination" of the facts in light of the trial record. 28 U.S.C. § 2254-(d)(1), (2). Jackson does not present substantial evidence of racial bias in jury selection beyond questionable distinctions in juror testimony. The trial court's decision to permit the state to exercise its peremptory strikes as it did falls well within the "the range of reasonable judgment" afforded by AEDPA. *See Yarborough*, 541 U.S. at 664. Therefore, Jackson's request for habeas relief on this issue is denied.

D.

Jackson contends that the trial court should have instructed the jury that any unadjudicated extraneous offenses introduced during the punishment phase needed to be proven beyond a reasonable doubt. Jackson relies on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which held that "[o]ther than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," and *Ring v. Arizona*, 536 U.S. 548, 609 (2002), which

extended *Apprendi* to capital cases. Jackson's claim is barred by the non-retroactivity principles of *Teague v. Lane*, 489 U.S. 288 (1989), and at any rate, the state court's refusal to deny a special instruction is not contrary to clearly established federal law as articulated by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Therefore, we deny his request for a COA on that issue.

Under *Teague*, the relevant inquiry is "whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Goeke v. Branch*, 514 U.S. 115, 118 (1995) (internal quotations omitted).[14] *Apprendi* and *Ring* create new rules of constitutional law that are not retroactively applicable to cases under federal habeas review.[15] Therefore, the only question left to answer is when Jackson's conviction became final.

"A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v. Bohlen*, 510 U.S.

---

[13](...continued)
Contrary to what Jackson contends, Summers's statement does not show confusion on Issue No. 2.

[14] The *Teague* rule is subject to limited exceptions not applicable here. *See Gilmore v. Taylor*, 508 U.S. 333, 345 (1993).

[15] *See United States v. Brown*, 305 F.3d 304, 310 (5th Cir. 2002) ("*Apprendi* creates a new rule of criminal procedure which is not retroactively applicable to initial petitions under § 2255."); *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) ("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review.").

9

383, 390 (1994). Jackson's motion for rehearing was denied on June 9, 1999, so he had ninety days from that date to file a certiorari petition. *See* SUP. CT. R. 13. On September 7, 1999, therefore, Jackson's conviction became final, the year before *Apprendi* was decided. Therefore, *Teague* bars Jackson's claim.[16]

We note that even if *Teague* did not apply here, *Apprendi* and *Ring* would not provide Jackson with a legal basis for a COA. *Ring* states only that "[i]f a State makes an *increase* in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602 (emphasis added).

The only fact capable of elevating Jackson's charge to capital murder was proof of remuneration.[17] The state introduced evidence of unadjudicated offenses only to prove future dangerousness in the sentencing phase, where the jury must exercise its discretion to decide whether to impose a death sentence or life imprisonment without parole.[18]

Therefore, Jackson invites us to answer the unresolved question whether *Ring* and *Apprendi* apply to *any* fact found by a jury that bears on its ultimate decision to impose death, or merely those facts that increase the authorized punishment to death. Because the trial court's decision not to require such an instruction is not contrary to clearly established Supreme Court precedent, we would in any event deny a COA.

E.

Similarly, Jackson asserts that the mere admission of evidence of unadjudicated, extraneous offenses violates his rights under the Eighth and Fourteenth Amendments and justifies a COA. Because Jackson cites no authority specifically for this proposition, the argument is waived for inadequate briefing.[19]

Even if the argument were not waived, Jackson would not be entitled to a COA. If he cannot prove that a COA should issue as to whether unadjudicated extraneous offenses need to be proven beyond a reasonable doubt, then *a fortiori* he cannot prove that a COA should issue as to whether such offenses are *per se* inadmissible. Because he does not point to any Supreme Court precedent foreclosing the trial court's decision to permit evidence of unadjudicated extraneous offenses, he cannot make a substantial showing of a denial of a

---

[16] Jackson appears to concede that *Teague* bars his claim. His brief states that "[p]etitioner's issue rests not on *Apprendi* alone, but on Eighth and Fourteenth Amendment protections which are not barred by *Teague*." Because Jackson nowhere describes what these protections might be, we assume this issue presents only a claim under *Apprendi* and *Ring*, which is procedurally barred.

[17] *See* TEX. PENAL CODE § 19.03(a)(3) ("A person commits [capital murder] if the person commits murder as defined under [the relevant statute] and . . . the person commits the murder for remuneration.").

[18] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).

[19] *See* L & A Contracting Co. v. S. Concrete Servs., 17 F.3d 106, 113 (5th Cir. 1994) (stating that failure to cite authority constitutes waiver).

constitutional right.[20]

### F.

Jackson claims that he deserves a COA because the trial court refused, in violation of his Eighth and Fourteenth Amendment rights, to instruct the jury that failure to reach a verdict on either of two special issues would automatically result in a life sentence. The Texas Code of Criminal Procedure provides that if the jury is unable to answer a special issue unanimously in the affirmative or negative, "the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life imprisonment without parole." TEX. CODE CRIM. PROC. art. 37.071 § 2(g). The Code also provides, however, that "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [special] issues[.]" *Id.* at § 2(a). Jackson maintains that this provision violates the Eighth and Fourteenth Amendments by failing to inform a capital sentencing jury of relevant state sentencing law.

This claim is without merit. In *Jones v. United States*, 527 U.S. 373, 381-82 (1999), the Court held that the Eighth Amendment does not require a court to instruct a capital jury about the consequences of deadlock. The Court noted that the Eighth Amendment requires that a death sentence not be arbitrarily imposed, *id.* at 381, but rejected the argument that "a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior," *id.* at 382. Because *Jones* controls, reasonable jurists would not disagree with the district court's resolution of this issue. We deny a COA on this question.

### G.

Jackson alleges the trial court violated his Eighth Amendment rights by failing to instruct the jury that it could consider mitigating evidence even if it did not relate to moral blameworthiness. Specifically, Jackson argued at the punishment phase that the jury should receive the following instruction:

> The term "mitigating" evidence or "mitigating" factor as used herein means any type of evidence relating to the defendant's background, character or the circumstances of the crime that would militate in favor of a life sentence rather than a death sentence. Evidence may be mitigating even if it does not relate in any way to the defendant's moral culpability or moral blameworthiness for the capital murder listed in the indictment.

Instead, the court gave the following instruction (in relevant part):

> A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstance of the crime which you believe could make a death sentence inappropriate in this

---

[20] *See Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005) (denying a COA on this issue because "there is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct"), *cert. denied*, 126 S. Ct. 1434 (2006); *see also Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987) (holding that "the admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the [E]ighth and [F]ourteenth amendments").

case . . . . In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstance of the offense that mitigates against the imposition of the death penalty.

Jackson apparently reasons that, by merely including background, character, and circumstances of the offense as modifiers of the general category of moral blameworthiness, instead of expressing these criteria in the conjunctive, the state unconstitutionally limited the scope of the mitigating instruction for Special Issue 2.

The Texas Code of Criminal Procedure provides that the court shall instruct the jury (should the jury make certain preliminary findings) that it shall consider "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," in determining whether a defendant should receive life without parole instead of death. TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1). Later, however, the Code defines "mitigating evidence" for purposes of this section as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." *Id.* § 2(f)(4).

Relevant mitigating evidence must be within the "effective reach" of the jury during punishment. *Johnson v. Texas*, 509 U.S. 350, 368 (1993) (internal quotation omitted). "[I]n a capital case, the sentencer must . . . be able to consider and give effect to [mitigating] evidence in imposing [a] sentence, so that the sentence imposed . . . reflects a reasoned mor-

al response to the defendant's background, character, and crime." *Penry v. Johnson*, 532 U.S. 782, 788 (2001) (internal quotations omitted). The sentencing instructions must provide the jury with an adequate vehicle to consider Jackson's evidence and come to a reasoned moral conclusion. *See id.* at 800.

The trial court's determination that the instructions were constitutionally adequate is not "contrary to" clearly established federal law as articulated by the Supreme Court. In fact, in *Johnson* the Court approved of a mitigating instruction under the predecessor statute to the current provisions of the Texas Code that was less specific in its articulation of the relevant mitigating factors:

> In determining each of these [Special] Issues, you may take into consideration all the evidence submitted to you in the trial of this case, whether aggravating or mitigating in nature, that is, all the evidence in the first part of the trial when you were called upon to determine the guilt or innocence of the Defendant and all the evidence, if any, in the second part of the trial wherein you are called upon to determine the answers to the Special Issues.

*Johnson*, 509 U.S. at 355.

Neither was the instruction an "unreasonable application" of clearly established federal law. In *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001), we held that the current statute "does not unconstitutionally 'preclude[] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death'" (citing *Lockett v. Ohio*, 438 U.S. 586, 604

(1978)). We noted that the definition of mitigating evidence in § 2(f)(4) does not put any relevant evidence beyond the effective reach of the jury, because "[v]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues." *Id.* (citing *Graham v. Collins*, 506 U.S. 461, 476 (1993)).

This circuit has declined to articulate a precise test for what qualifies as "objectively unreasonable" under AEDPA.[21] Where, however, a state court reaches a conclusion consistent with this circuit's precedent, it presumptively falls within the broad discretion afforded the state court under § 2254(d)(1), because we presumably would consider our own case law as within "the range of reasonable judgment" afforded by Supreme Court decisions. *See Yarborough*, 541 U.S. at 664.

Furthermore, the trial court could reasonably have concluded that the mitigating evidence offered by Jackson—that he was loved and admired by his family, assisted his grandmother, and provided help at his church and Sunday school—all sufficiently related to his "moral blameworthiness" as to come within the effective reach of the jury. Therefore, reasonable jurists could not disagree with the district court's application of AEDPA's deferential "unreasonable application" standard to Jackson's claim. We deny a COA on this issue.

### H.

Jackson avers that he is entitled to a COA because the district court denied his motion for appointment of an expert in false confessions to support his claim that his confession was coerced and therefore inadmissible. Where expert services are "reasonably necessary" to mount a defense in a post-conviction proceeding, the district court may authorize the defense attorneys to obtain such services and shall pay the relevant expenses. 21 U.S.C. § 848(q)(9).[22] Jackson argues that expert assistance was reasonably necessary because the circumstances surrounding the police interviews of Jackson and Smith raised a question as to the existence of remuneration. Specifically, when the police first interviewed Smith, he made no mention of paying Jackson for the murder. Only after Jackson confessed were police able to establish remuneration by further questioning Smith.

The state responds by noting that ruling on a motion to provide expert assistance is within the discretion of the district court. *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000). Also, the state argues that any testimony rendered by the expert would be procedurally barred in a federal habeas proceeding because it was never presented in state court. Finally, because the jury's credibility determination is entitled to a presumption of correctness, Jack-

---

[21] *See Neal v. Puckett*, 286 F.3d 230, 246 n.14 (2002) (en banc) ("To the extent that a nuanced, contextual interpretation of 'objectively unreasonable' emerges from [the] process [of applying the standard in individual cases] over time, this elaboration will be more useful and meaningful than any definition we might choose to impose ab initio.").

[22] An indigent defendant is entitled to the provision of all reasonably necessary services under, *inter alia*, § 848(q)(9). 21 U.S.C. § 848(q)(4)(B); *Fuller v. Johnson*, 114 F.3d 491, 502 (5th Cir. 1997). Jackson does not claim indigence, but in any event he would still need to demonstrate, under this section, that provision of a confession expert is "reasonably necessary."

son has not presented evidence to rebut that presumption and make necessary the appointment of an expert.

A COA is not required to appeal the denial of funds for expert assistance. *Hill*, 210 F.3d at 487 n.3. Therefore, we may review the claim on direct appeal for abuse of discretion. *Id.* at 487. We will uphold a denial of funding where the petitioner has "(a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought after assistance would only supplement prior evidence." *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005) (internal citations omitted).

The district court did not abuse its discretion. At trial, Jackson testified that the police told him to confess that Smith paid him for murder in exchange for a lesser charge. The defense also presented two expert witnesses who testified that Jackson had a learning disability and was below average in intelligence, and that Jackson was prone to self-deprecation and other antisocial behaviors. Therefore, the testimony of a false confession expert would merely have supplemented other evidence already available to and considered by the jury. *See id.* at 288-89 (finding no abuse where expert testimony would merely reinforce testimony already given by defendant).

Even if we were inclined to agree as an initial matter that a false confession expert's testimony was reasonably necessary for Jackson's defense, the relevant statute vests discretion squarely in the district court.[23] Therefore, we

---

[23] 21 U.S.C. § 848(q)(9) (stating that "the court (continued...)

affirm the denial of Jackson's motion for expert assistance.

For the above reasons, Jackson's request for a COA is GRANTED in part and DENIED in part. The judgment on the issue on which we grant a COA, and on the claim for which no COA is required, is AFFIRMED.

---

[23](...continued)
*may* authorize the defendant's attorneys to obtain such services on behalf of the defendant") (emphasis added). *See also Smith*, 422 F.3d at 289 (noting that change in AEDPA from the mandatory "shall" to discretionary "may" language in § 848(q)(9) "can only reasonably be construed as changing a mandatory granting of funds to a discretionary granting of funds even if the reasonable necessity language is complied with").

DENNIS, Circuit Judge, concurring:

I respectfully concur in the judgment only. I cannot subscribe fully for several reasons.

First, I respectfully disagree with the majority's broad, not clearly or immediately qualified, suggestions that AEDPA requires that federal courts apply a "deferential standard of review," "defer to the state court's adjudication of a defendant's claims," and presume that a state court's conclusion "consistent with this circuit's precedent...falls within the broad discretion afforded the state court under § 2254(d)(1)[.]" The statute cited simply provides that

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

The statute says nothing about deference, a deferential standard, circuit court precedent, presumptions of correctness, or broad discretion. Although Justice Stevens has spoken of AEDPA as having "plainly sought to ensure a level of 'deference to

-15-

the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way[,]," <u>Williams v. Taylor</u>, 529 US 362, 386 (2000)(Stevens, J.), he makes clear that AEDPA does not intend for us to accord deference in the ordinary and commonly understood sense.

> [I]t is significant that the word "deference" does not appear in the text of the statute itself. Neither the legislative history nor the statutory text suggests any difference in the so-called "deference" depending on which of the two phrases is implicated. Whatever "deference" Congress had in mind with respect to both phrases, it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in

error. As Judge Easterbrook noted with respect to the phrase "contrary to": "Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails." <u>Lindh</u>, 96 F.3d, at 869.

<u>Williams</u>, 529 US at 386-7. Justice Stevens further states

> As Judge Easterbrook has noted, the statute surely does not require the kind of "deference" appropriate in other contexts: "It does not tell us to 'defer' to state decisions, as if the Constitution means one thing in Wisconsin and another in Indiana. Nor does it tell us to treat state courts the way we treat federal administrative agencies. Deference after the fashion of <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), depends on delegation. <u>See Adams Fruit Co. v. Barrett</u>, 494

U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Congress did not delegate either interpretive or executive power to the state courts. They exercise powers under their domestic law, constrained by the Constitution of the United States. 'Deference' to the jurisdictions bound by those constraints is not sensible." Lindh v. Murphy, 96 F.3d 856, 868 (C.A.7 1996) (en banc), rev'd on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Id. at n.13.

Although these observations appear in part II of Justice Stevens' opinion in Williams v. Taylor, which did not carry a majority, Justice O'Connor, who wrote part II for the majority, and Chief Justice Rehnquist, the only other Justice to write separately, did not disagree with Justice Stevens' statement that AEDPA "surely does not require the kind of 'deference' appropriate in other contexts" )Lindh v. Murphy, 96 F.3d 856, 868 (7th Cir. 1996)); rather, they dispute his interpretation of the phrase "contrary to, or an unreasonable application of." I believe that the majority's treatment of deference in connection with AEDPA, without needed explanation and qualification, is unnecessary and tends to be misleading and confusing.

Second, § 2254(e)(1) of AEDPA provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness

-17-

by clear and convincing evidence.

This provision has nothing to do with fact-finding by the jury at the guilt or penalty phases of a capital murder trial. This section relates only to fact-finding by a state court in a state habeas proceeding. The applicant here simply did not carry his burden; he failed to present any new evidence in his habeas petition on this point. If he had done so, I do not believe that AEDPA authorizes the federal courts to erect a presumption against the petitioner in habeas proceedings based solely on the jury verdict at trial. Rather, this court would still be bound to determine whether the state court's determination was reasonable in light of all the evidence presented at the state court habeas proceeding. The case the majority cites for the proposition, United States v. Cathey, 259 F.3d 365, 368 (5th Cir. 2001), discusses the issue in a case heard on direct appeal and, I believe, is inapposite here.

Third, the jury instruction given by the Texas trial court at the capital sentencing proceeding required the jury to consider essentially any factor "that mitigates against the imposition of the death penalty." Under the circumstances and in the context of this case, the Texas courts' denial of habeas relief

because of the arguable lack of complete perfection in this instruction was not contrary to or an unreasonable application of federal law as clearly established by the Supreme Court's decisions. The discussion of <u>Johnson v. Texas</u>, 509 U.S. 350,(1993), which presented a different issue and was decided with respect to a superseded sentencing regime, is unnecessary and may lead to confusion.

For the reasons given, I respectfully concur in the judgment only.