# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 22, 2011

No. 10-70025

Lyle W. Cayce
Clerk

CARL HENRY BLUE,

Petitioner – Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent – Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In a habeas proceeding under 28 U.S.C. § 2254, petitioner Carl Henry Blue raised twenty-one separate challenges to his death sentence. The district court denied relief. Blue seeks a certificate of appealability for five issues. We will deny the request.

# I.

In 1994 a Texas jury found Carl Henry Blue guilty of capital murder, and Blue received a death sentence. The Texas Court of Criminal Appeals ("the CCA") affirmed Blue's conviction on direct appeal in 1996 and denied his first state habeas application in 1999. The following year, the federal district court vacated Blue's death sentence on the ground that the State's expert witness had testified during the punishment-phase trial that Blue was more likely to be a future danger to society because he is black. A second punishment-phase trial took place in 2001. Once again the jury's answers to the special issues led the district court to sentence Blue to death. The CCA affirmed Blue's new sentence on direct appeal in 2003 and denied his second state habeas application in 2004. Blue timely filed a skeletal federal habeas petition in 2005. The district court then promptly stayed and abated the proceedings, enabling Blue to assert a claim under *Atkins v. Virginia*[1] in a third state habeas application. The CCA determined that Blue had not made out a prima facie case for *Atkins* relief and dismissed his third application as an abuse of the writ in 2007. Blue then returned to federal court, where the district court denied Blue's petition in its entirety in August 2010.

# II.

Blue seeks to appeal the district court's determinations that he is not entitled to habeas relief on (1) his claim under *Atkins v. Virginia* that his mental retardation bars his execution; and (2) various claims that the jury instructions at his punishment-phase trial violated the Eighth Amendment. Before a § 2254

---

[1] 536 U.S. 304, 321 (2002) (holding that the Eighth Amendment prohibits the imposition of the death penalty on anyone who is mentally retarded).

petitioner can appeal, he must obtain a certificate of appealability ("COA").[2] We will issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."[3] Where, as here, "a district court has rejected the constitutional claims on the merits," a petitioner is not entitled to a COA unless he can "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[4] In death penalty cases, "'any doubts as to whether a COA should issue must be resolved in the petitioner's favor.'"[5]

Treating the *Atkins*-related issues and the jury-instruction issues in turn, we hold that the district court did not abuse its discretion by declining to hold an evidentiary hearing nor err by using IQ scores to assess Blue's general intellectual functioning; that the proper focus now is upon the CCA's determination of Blue's general intellectual functioning, a determination entitled to AEDPA deference; and that, in any event, any error would be harmless because Blue does not challenge the district court's determinations that he has failed to satisfy the other two elements of the test for mental retardation. We also reject the three remaining challenges as foreclosed by circuit precedent: Blue's challenge to the "moral blameworthiness" language in Texas's capital-sentencing jury instructions; Blue's challenge to the failure to assign a burden of proof on the mitigation special issue; and his challenge to the "10-12" Rule.

---

[2] 28 U.S.C. § 2253(c)(1)(A).

[3] *Id.* § 2253(c)(2).

[4] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[5] *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (quoting *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005)) *cert. denied*, 131 S. Ct. 1815 (2011).

## III.

Blue presented his *Atkins* claim to the CCA in his third state habeas application.[6]   Holding that Blue had "failed to meet his burden to present sufficient specific facts from which, even if true, we could reasonably conclude, by clear and convincing evidence, that no rational fact-finder would fail to find he is mentally retarded,"[7] requirements of Texas Code of Criminal Procedure article 11.071 § 5(a)(3), the CCA dismissed Blue's habeas application as an abuse of the writ.[8]   Section 5(a)(3) codifies an actual-innocence-of-the-death-penalty exception to Texas's rule of procedural default.[9]

The State unsuccessfully argued to the district court that Blue had procedurally defaulted his *Atkins* claim,[10] and did not re-urge procedural default in its response to Blue's motion for a COA.   In short, the state accepts that the CCA decided the merits of Blue's *Atkins* claim.

---

[6] *See generally Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007).

[7] *Id.* at 167–68.

[8] *Id.* at 168.

[9] *Rocha v. Thaler*, 626 F.3d 815, 822 (5th Cir. 2010), *cert. denied*, No. 10-9659, 2011 WL 1060963, at *1 (Oct. 11, 2011).  *See generally Sawyer v. Whitley*, 505 U.S. 333 (1992).

[10]  *See* Memorandum and Order at 11–15, *Blue v. Thaler*, No. H-05-2726 (S.D. Tex. Aug. 19, 2010).

4

Whether a habeas petitioner is mentally retarded is a question of fact.[11] Under § 2254(d)(2) we cannot grant habeas relief unless the CCA's adjudication of Blue's *Atkins* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[12] Section 2254(e)(1) supplements § 2254(d)(2) by further providing that "a determination of a factual issue made by a State court shall be presumed to be correct" in a subsequent federal habeas proceeding and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[13] The clear-and-convincing evidence standard of § 2254(e)(1)—which is "arguably more deferential" to the state court than is the unreasonable-determination standard of § 2254(d)(2)[14]—pertains only to a state court's determinations of particular factual issues, while § 2254(d)(2) pertains to the state court's decision as a whole.[15]

---

[11] *See Maldonado v. Thaler*, 625 F.3d 229, 233 (5th Cir. 2010) ("[T]he ultimate issue of whether [a] person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility." (quoting *Ex parte Briseño*, 135 S.W.3d 1, 9 (Tex. Crim. App. 2004)), *cert. denied*, No. 10-9511, 2011 WL 4530498, at *1 (Oct. 3, 2011); *Rivera v. Quarterman*, 505 F.3d 349, 361–63 (5th Cir. 2007), *cert. denied*, 555 U.S. 827 (2008); *see also Williams v. Quarterman*, 293 F. App'x 298, 308 (5th Cir. 2008) (per curiam) (unpublished) ("The determination of whether *Briseño*'s three prongs have been met is a factual finding . . . .").

[12] 28 U.S.C. § 2254(d)(2).

[13] *Id.* § 2254(e)(1).

[14] *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).

[15] *See Miller-El v. Cockrell*, 537 U.S. 322, 341–42 (2003).

Section 2254(d)(2) commands substantial deference to the factual determinations made by state courts.[16] It is not enough to show that a state court's decision was incorrect or erroneous. A petitioner must show that the decision was objectively unreasonable, "a substantially higher threshold."[17] To clear that threshold, the petitioner must show that "a reasonable factfinder *must* conclude" that the state court's determination of the facts was unreasonable.[18] "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[19]

---

[16] *See Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir. 2005) ("With respect to the review of factual findings, AEDPA significantly restricts the scope of federal habeas review."), *cert. denied*, 546 U.S. 1217 (2006); *see also Hogues v. Quarterman*, 312 F. App'x 684, 686 (5th Cir.) (per curiam) (unpublished) (describing 28 U.S.C. § 2254(d)(2) & (e)(1) as "highly deferential to the state court"), *cert. denied sub nom. Hogues v. Thaler*, 130 S. Ct. 373 (2009).

[17] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003).

[18] *Rice v. Collins*, 546 U.S. 333, 341 (2006) (emphasis added); *see also Miller-El v. Dretke*, 545 U.S. 231, 275 (2005) (Thomas, J., dissenting) (explaining that a petitioner is not entitled to relief under § 2254(d)(2) unless he can "show that, based on the evidence before the Texas state courts, the only reasonable conclusion was that" a constitutional violation occurred).

[19] *Wood*, 130 S. Ct. at 849; *see also Collins*, 546 U.S. at 342 (stressing that AEDPA forbids a federal court from using "a set of debatable inferences" to set aside a state court's factual determination). Discussing § 2254(d) generally, the Supreme Court recently explained that a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-787 (2011).

## A.

Blue argues that the district court's refusal to hold an evidentiary hearing was an abuse of discretion because the conflicting expert testimony as to whether he is retarded created a genuine issue of fact as to the merits of his *Atkins* claim.[20]  "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court."[21]  The State concedes that § 2254(e)(2) does not bar Blue from obtaining an evidentiary hearing,[22] so we will review the district court's decision not to hold a hearing for an abuse of discretion.[23]

This Court has long held that a district court's refusal to hold an evidentiary hearing in a § 2254 proceeding is an abuse of discretion only if the petitioner can show that (1) "the state did not provide him with a full and fair hearing," and (2) the allegations of his petition, "if proven true, . . . would entitle him to relief."[24]  To this, the Supreme Court has recently added "that review

---

[20] Request for the Issuance of a COA and Supporting Brief at 16–17, *Blue v. Thaler*, No. 10-70025 (5th Cir. Dec. 3, 2010).

[21] *Schriro*, 550 U.S. at 468; *see also Clark v. Johnson*, 202 F.3d 760, 765 (5th Cir.) ("[O]vercoming the preclusive effect of § 2254(e)(2) does not *guarantee* an evidentiary hearing, it only opens the door for one."), *cert. denied*, 531 U.S. 831 (2000).  If a petitioner "has failed to develop the factual basis of a claim in State court proceedings," § 2254(e)(2) prohibits the district court from holding an evidentiary hearing unless the petitioner's claim falls within one of two narrow exceptions.

[22] Respondent's Opposition to Application for COA at 13, *Blue v. Thaler*, No. 10-70025 (5th Cir. Feb. 3, 2010).

[23] *See, e.g.*, *Pierce v. Thaler*, 604 F.3d 197, 200 (5th Cir. 2010) (citing *Clark*, 202 F.3d at 765–66).

[24] *Clark*, 202 F.3d at 766 (citing *Moawad v. Anderson*, 143 F.3d 942, 947–48 (5th Cir. 1998)); *accord Hall v. Quarterman*, 534 F.3d 365, 368–69 (5th Cir. 2008) (per curiam); *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir.), *cert. denied*, 531 U.S. 957 (2000).

under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."[25]  The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2),[26] as all nine Justices acknowledged.[27]

*Pinholster* thus imposes a new limitation on the availability of evidentiary hearings in habeas cases, a limitation not fully captured by our two-part standard.  In the broad run of cases, even when the first of the two preconditions to an evidentiary hearing is satisfied, § 2254(d) still requires deference to the state court's adjudication.[28]  And *Pinholster* prohibits a federal court from using

---

[25] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see also Greene v. Fisher*, 132 S. Ct. 38, slip op. at 4 (Nov. 8, 2011) (explaining that "§ 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did'" (alteration in original) (quoting *Pinholster*, 131 S. Ct. at 1399)).

[26] Just as § 2254(d)(1) "refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law," *Pinholster*, 131 S. Ct. at 1398, § 2254(d)(2) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was "based on" an unreasonable determination of the facts. "This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Id.*  Indeed, this mandate is reflected even more clearly in the text of § 2254(d)(2), which expressly instructs that the state court's decision must be evaluated "in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Third Circuit recently concluded that *Pinholster* applies with equal force under § 2254(d)(2).  *See Rountree v. Balicki*, 640 F.3d 530, 538 (3d Cir.) ("Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." (citing *Pinholster*, 131 S. Ct. at 1401–03)), *cert. denied*, No. 11-6567, 2011 WL 4459942, at *1 (Oct. 31, 2011).

[27] *See Pinholster*, 131 S. Ct. at 1400 n.7 (noting "[t]he additional clarity of § 2254(d)(2) on this point"); *id.* at 1411–12 (Alito, J., concurring in part and concurring in the judgment); *id.* at 1412 (Breyer, J., concurring in part and dissenting in part); *id.* at 1415 (Sotomayor, J., dissenting).

[28] *See Valdez v. Cockrell*, 274 F.3d 941, 948 (5th Cir. 2001) (holding that, in the broad run of cases, a state court's denial of a full and fair hearing "does not permit the district court to avoid the application of deference to the state court's adjudication on the merits"), *cert.*

evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d).[29]

That is not to say that there is no basis on which the district court could have made that determination in this case, because *Atkins* claims fall outside that broad run of cases in some circumstances. "[W]hen a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA."[30] This rule stems from the fact that *Atkins* created and protects a significant substantive liberty interest,[31] a liberty interest that entitles the petitioner to a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty.[32] This does not mean that states must give hearings to all persons with *Atkins* claims.[33] The states retain discretion to set

---

*denied*, 537 U.S. 883 (2002); *see also id.* at 951 ("[W]e hold that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.").

[29] *See Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring in part and dissenting in part) ("There is no role in [the] analysis [under § 2254(d)] for a habeas petitioner to introduce evidence that was not first presented to the state courts.").

[30] *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) (citing *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007)).

[31] *See Rivera*, 505 F.3d at 357–58 (explaining that *Atkins*, like *Ford v. Wainwright*, "affirmatively limit[s] the class of persons who are death penalty eligible" and "command[s] that 'the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender.'" (quoting *Atkins v. Virginia*, 536 U.S. 304, 321 (2002))).

[32] *See id.* at 357–58 & n.31.

[33] *Id.* at 359; *see also id.* at 358 ("*Atkins* did not specifically mandate any set of procedures . . . .").

9

gateways to full consideration and to define the manner in which habeas petitioners may develop their claims. But if a state court dismisses a prima facie valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim, it has run afoul of the Due Process Clause, and that due process violation constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference.[34] Under these narrowly defined circumstances, a district court abuses its discretion if it does not conduct an evidentiary hearing on an *Atkins* claim.

Texas closed its gate to Blue, concluding that he failed to present a claim with prima facie validity.[35] The propriety of the district court's decision not to grant further access to the federal decisional processes thus turns entirely on whether Blue's third state habeas application made a prima facie showing of mental retardation.

The evidence that Blue presented to the CCA, even when taken as true, would not support a finding that he is mentally retarded. *Atkins* left it to the states to formulate and adopt their own definitions of mental retardation.[36] In

---

[34] *See Wiley*, 625 F.3d at 207 ("'When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.'" (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007))); *Rivera*, 505 F.3d at 358 ("The lesson we draw from *Panetti* is that, where a petitioner has made a prima facie showing of retardation . . . , the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.").

[35] *See Rivera*, 505 F.3d at 357 (explaining that the "procedural effect" of a finding by the CCA that an *Atkins* petitioner "has not made a prima facie showing" of mental retardation is to deprive the petitioner "of the opportunity to develop fully the substance of his claim before the state courts").

[36] *Atkins v. Virginia*, 536 U.S. 304, 317 (2002).

*Ex parte Briseño*, the CCA adopted the definition of mental retardation promulgated by the former American Association on Mental Retardation ("AAMR").[37]  Under Texas law, "mental retardation is a disability characterized by: (1) significantly subaverage general intellectual functioning," defined as an IQ of about 70 or below; "(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18."[38]  A failure of proof on any one of these three elements will defeat an *Atkins* claim.[39]

Blue failed to tender evidence to the CCA that, if true, establishes that he exhibits significantly subaverage general intellectual functioning.  The CCA follows the former AAMR in defining "significantly subaverage intellectual functioning" as "an IQ of about 70 or below."[40]  IQ is measured using standardized testing instruments such as the Wechsler Adult Intelligence Scale.  Such instruments "'have a measurement error of approximately 5 points in assessing IQ,'" with the result that "any score could actually represent a score that is five points higher or five points lower than the actual IQ."[41]  Thus, a person whose

---

[37] 135 S.W.3d 1, 7–8 (Tex. Crim. App. 2004).  The former AAMR is now known as the American Association of Intellectual and Developmental Disabilities.

[38] *Id.* at 7 (footnotes and internal quotation marks omitted).

[39] *See Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (explaining that "[i]t is plain that" *Briseño* "require[s] that all three elements exist to establish mental retardation."), *cert. denied*, 549 U.S. 1254 (2007); *see also Maldonado v. Thaler*, 625 F.3d 229, 241 (5th Cir. 2010) ("[F]ulfillment of each prong is necessary to a finding of mental retardation . . . ."), *cert. denied*, No. 10-9511, 2011 WL 4530498, at *1 (Oct. 3, 2011); *In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006) (per curiam) ("To state a successful claim, an applicant must satisfy all three prongs of this test." (citing *Hall v. State*, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004) (en banc))).

[40] *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App.), *cert. denied sub nom. Hearn v. Texas*, 131 S. Ct. 507 (2010).

[41] *Id.* (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (rev. 4th ed. 2000)).

true Weschler IQ score is 70 might obtain a score as high as 75 or as low as 65.[42] While the CCA has declined to adopt a "bright-line [IQ-based] exemption from execution," it does "interpret[] the 'about 70' language of the AAMR's definition of mental retardation to represent a rough ceiling, above which a finding of mental retardation in the capital context is precluded."[43] As a result, the CCA held in *Ex parte Hearn* that "non-IQ evidence [is] relevant to an assessment of intellectual functioning only where" the petitioner has also produced "a full-scale IQ score [that is] within the margin of error for standardized IQ testing"[44]—a full-scale IQ score, in other words, of 75 or lower.

*Hearn* establishes that, under Texas law, the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim.[45] This Court has previously held that *Atkins* gives the states discretion in how they define and determine the existence of mental retardation.[46] The CCA's use of 75 as its upper-limit IQ-score cutoff

---

[42] *Id.* at 428 n.8.

[43] *Id.* at 430; *see also id.* at 430 n.17 (collecting cases that have applied this standard).

[44] *Id.* at 431.

[45] *See Maldonado v. Thaler*, 625 F.3d 229, 240 (5th Cir. 2010) ("[T]he TCCA has indicated that a full-scale IQ score should provide the basis for any assessment of intellectual functioning." (citing *Hearn*, 310 S.W.3d at 431)), *cert. denied*, No. 10-9511, 2011 WL 4530498, at *1 (Oct. 3, 2011).

[46] *Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006), *cert. denied*, 549 U.S. 1254 (2007); *see also Bobby v. Bies*, 129 S. Ct. 2145, 2150 (2009) (noting that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation" is entitled to habeas relief and instead "'le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction'" (alteration in original) (quoting *Atkins v. Virginia*, 536 U.S. 304, 317 (2002))).

point tracks the DSM-IV's diagnostic criteria[47] and finds support in *Atkins* itself.[48] By acknowledging that a petitioner whose IQ score is just above 70 could still make a showing of mental retardation, the *Hearn* standard also takes heed of prior admonitions from both this Court and the CCA that IQ scores should be interpreted with awareness of the margin of error in the statistical analysis.[49]

Blue did not present the CCA with evidence that he had attained a full-scale IQ score of 75 or lower. The only evidence of IQ that Blue presented in his state-court proceeding was a transcript of a portion of the testimony of Dr. Windell Dickerson. Dr. Dickerson testified at Blue's punishment-phase trial that he had administered to Blue several short-form versions of the verbal portions of the Weschler test and concluded that Blue "has an actual IQ in the range of 75 to 80." This evidence is insufficient to support Blue's *Atkins* claim. While a full-scale IQ score of 75 might correspond to an actual IQ of 70,[50] Dr. Dickerson did not testify that Blue received a score of 75 on a full-scale IQ test. Rather, Dr. Dickerson concluded from Blue's performance on short-form versions of the test that Blue's actual IQ was between 75 and 80. In any case, as Blue himself argued to the CCA, the result of a short-form test is not a reliable substitute for

---

[47] *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41–42 (rev. 4th ed. 2000) ("[I]t is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit deficits in adaptive behavior.").

[48] *See Atkins*, 536 U.S. at 309 n.5 ("[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." (citing 2 KAPLAN & SADOCK'S COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 2952 (B. Sadock & V. Sadock eds., 7th ed. 2000))).

[49] *See, e.g.*, *Ex parte Briseño*, 135 S.W.3d 1, 7 n.24 (Tex. Crim. App. 2004); *Clark*, 457 F.3d at 444–45; *Moore v. Quarterman*, 342 F. App'x 65, 70 n.8 (5th Cir. 2009) (per curiam) (unpublished), *cert. denied sub nom. Thaler v. Moore*, 130 S. Ct. 1736 (2010).

[50] *See Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App.), *cert. denied sub nom. Hearn v. Texas*, 131 S. Ct. 507 (2010).

a full-scale IQ score.[51]  The CCA declined to "try to extrapolate an accurate IQ" based on "an incomplete test score" and instead chose to "simply regard the record as it comes to us as devoid of any reliable IQ score."[52] As a consequence, it concluded that "the only evidence of an IQ score that the applicant has tendered fails to present sufficient specific facts that, even if true, would establish significant sub-average general intellectual functioning by clear and convincing evidence."[53]

Nor did any of the other evidence that Blue presented to the CCA support a finding that he is mentally retarded or that he exhibits significantly subaverage general intellectual functioning.  Blue offered into evidence some of his school records, affidavits from friends and family members, and a sworn declaration from Dr. James R. Patton.  Dr. Patton prepared his declaration after reviewing all of the other record materials.  The most relevant portions of his declaration state:

> I want to note at the outset that there is a paucity of information presented that makes it impossible to conclude whether Mr. Blue is mentally retarded.  There is, however, enough information that is consistent with Mental Retardation and that would justify a further inquiry, including full scale intellectual testing and a [sic] in depth investigation into Mr. Blue's background to determine the existence of mental retardation.  In other words, Mr. Blue might well be mentally retarded and nothing that I have seen is inconsistent with that determination. . . .
>
> Mr. Blue's school records indicate a number of troubling areas.  There is a consistent inability to perform academically. . . .  Clearly, these deficits in learning ability may well be attributable to causes

---

[51] *See Ex parte Blue*, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007) ("The applicant argues that short form testing such as that which Dickerson utilized is not a reliable measure of IQ.").

[52] *Id.*

[53] *Id.*

> other than mental retardation; for example, learning disabilities and/or an impoverished family background may well have played a role, even a determinative one. Mental Retardation, however, cannot be ruled out and additional assessment methods should be authorized and employed to determine this. . . .

> A review of the declarations of those who knew Mr. Blue best also support, but do not establish, a diagnosis of mental retardation and indicate a need for a more comprehensive assessment. . . . Most of the reports about Mr. Blue note his gullibility, a trait shared by individuals who are mentally retarded. . . . An inability to perform daily self-help functions is also an adaptive deficit common or frequently found among persons who are mentally retarded. . . . The lack of adaptive skills noted by these reporters is common to the patterns of behavior associated with persons who have mental retardation. . . .

> All of these deficits suggest limitations in adaptive functioning and support a claim of mental retardation. While, as I have stated before, there are other possible explanations for these problems, mental retardation certainly cannot be ruled out and indeed, is strongly suggested by this pattern of adaptive deficits. Viewed in isolation, none of these factors would be dispositive; taken as an overall pattern, mental retardation is strongly suspected. Only a full and thorough assessment, however, can answer that question.

Dr. Patton's affidavit is tentative and inconclusive at best. It also focuses exclusively on limitations in adaptive functioning, the second of *Briseño*'s three criteria for diagnosing mental retardation. Nothing in the affidavit would support a conclusion that the first *Briseño* criterion, significantly subaverage general intellectual functioning, has been satisfied.

Finally, the new IQ evidence that Blue presented in the proceedings below also does not support a finding of significantly subaverage general intellectual functioning. Even if, despite *Pinholster*,[54] we would consider it, Blue obtained

---

[54] *See supra* notes 26–30 and accompanying text.

two full-scale IQ scores of 76 and 77,[55] both of which are above the rough ceiling of 75 established by *Hearn*.   Blue advanced three theories to support his argument that his IQ score should be adjusted downward into the range that would qualify him for a diagnosis of mental retardation, but the district court rejected each of these theories by making findings of fact that are well supported by the record.[56]

Even when the CCA's decision is evaluated in light of the newly expanded federal court record, its determination that Blue has not made out a prima facie claim of mental retardation is objectively reasonable.   Accordingly, the CCA did not violate the Due Process Clause so as to deprive its decision of § 2254(d)(1) deference by denying Blue the opportunity to further develop his *Atkins* claim. Federal review thus must proceed under § 2254(d), and there was no reason for the district court to conduct an evidentiary hearing.

### B.

Blue also challenges the district court's dismissal of his *Atkins* claim by asserting that the court employed an improper "'bright-line' standard for assessing intellectual disability."[57]  Blue offers scant argumentative support for this assertion.   He does no more than point out that "the District Court . . . specifically implied that without at least one IQ score below 70 a Petitioner could not obtain relief under *Atkins*" before "respectfully submit[ting] that the

---

[55] Memorandum and Order, *supra* note 10, at 21–22.

[56] *See id.* at 24–26.  *See generally Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir.) (per curiam) ("In an appeal from the denial of habeas relief, this court reviews a district court's findings of fact for clear error . . . ."), *cert. denied*, 534 U.S. 1001 (2001).

[57] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 18.

fundamental unfairness involved in this type of gatekeeping by the District Court cast doubt on the Court's entire opinion."[58]

This argument fails for three reasons. First, the district court did not adopt an improper bright-line, IQ-based test. The court's statement that an IQ score of 75 is "the base score that may qualify for a diagnosis of mental retardation"[59] reflects the standard that the CCA announced in *Hearn*. The district court also undertook an exhaustive survey of this Court's precedent and correctly concluded that "the Fifth Circuit has only granted relief on *Atkins* claims where an inmate presents at least one base score below 70" and "has denied relief when an inmate has IQ scores both under and over 70 and when all his scores fall above 70."[60] After rejecting Blue's arguments that his full-scale scores of 76 and 77 should be scaled downward into the sub-75 range, the district court concluded that "Blue has not produced an IQ score within the parameters serving as a precursor to a diagnosis of mental retardation."[61] The court's treatment of the IQ issue was consistent with controlling precedent from this Court and the CCA.

Second, an error by the district court in its application of the § 2254(d)(2) standard of review is not, by itself, grounds for issuing a COA.[62] At the COA stage, the question for decision is whether jurists of reason would debate the

---

[58] *Id.* at 20.

[59] Memorandum and Order, *supra* note 10, at 18.

[60] *Id.* at 19 (footnotes omitted) (collecting cases).

[61] *Id.* at 26; *see also id.* at 23 ("Taken at face value, none of Blue's IQ scores fall within the potentially broad range that allows for a finding of mental retardation.").

[62] *See, e.g., Day v. Quarterman*, 566 F.3d 527, 537 (5th Cir. 2009) ("'[T]his Court may affirm the denial of habeas relief on any ground supported by the record.'" (alteration in original) (quoting *Scott v. Johnson*, 227 F.3d 260, 262 (5th Cir. 2000))).

correctness of the conclusion that the state court's rejection of the petitioner's claim was objectively reasonable.[63]

Finally, even if the district court had erred in its assessment of Blue's general intellectual functioning, that error would have been harmless. Blue is entitled to a COA on his *Atkins* claim only if he can make a substantial showing that he has been denied his constitutional right to be exempt from execution due to mental retardation. To make that showing, he must satisfy all three elements of the *Briseño* test.[64] The district court found that he cannot satisfy *Briseño* prong two: "Blue has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation."[65] Blue does not challenge that finding in his application for a COA. His failure to do so waives the issue.[66] If a district court found that a habeas petitioner's *Strickland* claim failed because he could show neither deficient performance nor prejudice, a request for a COA only as to the deficiency issue would be futile. Similarly, because Blue has conceded that he cannot show that he suffers from significant limitations in adaptive functioning, reasonable jurists would not debate the correctness of the district court's conclusion that it was

---

[63] *See, e.g.*, *Pippen v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006).

[64] *See supra* note 43 and cases cited therein.

[65] Memorandum and Order, *supra* note 10, at 34.

[66] *See, e.g.*, *Ortiz v. Quarterman*, 509 F.3d 214, 215 (5th Cir. 2007) (per curiam) ("Although, in the proceedings below, Ortiz did raise a claim that his trial counsel rendered ineffective assistance . . . , he did not raise this ineffective assistance claim in the brief in support of his application for a COA in this Court. Accordingly, Ortiz has waived this ineffective assistance claim." (citing *Hughes v. Johnson*, 191 F.3d 607, 612–13 (5th Cir. 2007))). *See generally Brewer v. Quarterman*, 475 F.3d 253, 254 (5th Cir. 2006) (per curiam) ("[T]he waiver doctrine applies to COA applications.").

objectively reasonable for the CCA to determine that he is not mentally retarded.[67] We must deny Blue's motion for a COA on this issue.

## IV.

Blue raises three challenges to the constitutionality of Texas's capital sentencing scheme, all of which focus on the manner in which the jury was instructed at his second punishment-phase trial. First, he contends that the jury instructions did not provide the jury with an adequate vehicle to give full consideration and effect to his mitigating evidence, as required by *Penry v. Lynaugh* and progeny. Second, he challenges the failure to assign a burden of proof on the mitigation special issue. Third, he argues that the "10-12" Rule affirmatively misleads the jury. Each of these challenges is foreclosed by Circuit precedent.

Here are the pertinent portions of the state district court's instructions to the jury in Blue's punishment-phase trial:

> In determining your answers to the questions or special issues submitted to you, you shall consider all the evidence submitted to you in this trial. You shall consider all evidence submitted to you during the whole trial as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

> The burden of proof as to Special Issue No. 1 rests upon the State, and it must be proved beyond a reasonable doubt that the answer to Special Issue No. 1 should be "Yes."

> You are instructed that you may not answer Special Issue No. 1 "Yes" unless all jurors agree to such answer. Further, you may not answer this special issue "No" unless ten or more jurors agree. . . .

---

[67] *Accord Pierce v. Thaler*, 604 F.3d 197, 214 (5th Cir. 2010) (denying a COA on *Atkins* issues where the petitioner failed to challenge the district court's findings that he did not suffer from significant limitations in adaptive functioning).

SPECIAL ISSUE NO. 1, with forms for answers, is as follows: Is there a probability that the defendant, Carl Henry Blue, would commit criminal acts of violence that would constitute a continuing threat to society?

ANSWER: We the jury unanimously find and determine beyond a reasonable doubt that the answer to Special Issue No. 1 is "Yes," with a signature space for the Presiding Juror, or

ANSWER: We, the jury, because at least ten jurors have reasonable doubt as to the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, determine that the answer to Special Issue No. 1 is "No," with a signature space for the juror.

In the event the jury is unable to agree upon an answer to Special Issue No. 1 under the conditions and instructions outlined above, the juror will not sign either form of answer to the special issue. The jurors shall not discuss or consider the effect of the failure of the jury to agree on the answer to the special issue.

You are further instructed that if the jury makes an affirmative finding to Special Issue No.1—that is, an answer of "Yes"—then the jury shall answer Special Issue No. 2 below. You will answer this Special Issue No. 2 "Yes" or "No."

You may not answer the issue "No" unless all jurors agree to such answer, and you may not answer such issue "Yes" unless ten or more jurors agree to such answer. . . .

You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

The special issue with forms for answer is as follows:

SPECIAL ISSUE NO. 2: Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? . . .

In the event the jury is unable to agree to an answer to this Special Issue under the conditions and instructions given herein, the Presiding Juror will not sign either form of answer to the Special Issue.  The jurors shall not discuss or consider the effect of the failure of the jury to agree on the answer to the special issue.

## A.

First, Blue argues that the instructions given to the jury at his second punishment-phase trial violated his Eighth Amendment rights by providing the jury with an inadequate vehicle for giving full consideration and effect to his mitigating evidence.  Blue exhausted this claim by raising it as point of error number thirty in his direct appeal from the re-sentencing.[68]  The CCA rejected this claim on its merits,[69] so Blue is entitled to federal habeas relief only if he can show that the CCA's adjudication of the claim "resulted in a decision that was contrary to, or involved and unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[70]  The district court determined that Blue could not make this showing.  This Court should issue a COA only if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner."[71]

"[T]he Eighth Amendment requires that a capital sentencing jury's discretion be guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty in order to eliminate arbitrariness and capriciousness."[72]  As this Court explained in its en

---

[68] *See Blue v. State*, 125 S.W.3d 491, 504 (Tex. Crim. App. 2003).

[69] *See id.* at 505.

[70] 28 U.S.C. § 2254(d)(1).

[71] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[72] *Buchanan v. Angelone*, 522 U.S. 269, 274 (1998) (internal quotation marks omitted); *see also Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006) ("[A] state capital sentencing system

banc decision in *Nelson v. Quarterman*, the decisions of the Supreme Court clearly establish that the instructions given to a capital jury are unconstitutional if there is:

> a reasonable likelihood that the jury would interpret the Texas special issues in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence. This "full-effect" standard requires that a juror be able to express his reasoned moral response to evidence that has mitigating relevance beyond the scope of the special issues; i.e., a juror cannot be precluded from electing a sentence less than death if he believes that the mitigating evidence offered makes the defendant less morally culpable for the crime . . . .[73]

This standard became clearly established no later than 1989,[74] well before Blue's judgment of conviction became final in 2003.

A brief summary of the development in the law in this area helps put Blue's argument in context.[75] For many years Texas required capital sentencing juries to answer three special issues: the deliberateness special issue,[76] the future-

---

must . . . permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime.").

[73] 472 F.3d 287, 293 (5th Cir. 2006) (en banc) (citations omitted), *cert. denied*, 551 U.S. 1141 (2007).

[74] *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("[W]ell before our decision in *Penry I*, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty . . . .").

[75] For a more exhaustive history, see Judge Stewart's opinion in *Nelson*. 472 F.3d at 293–303.

[76] *See* TEX. CODE CRIM. PROC. art. 37.0711 § 3(b)(1) (asking "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result").

dangerousness special issue,[77] and the inadequate-provocation special issue.[78] But in 1989, the Supreme Court held in *Penry I* that these three special issues failed to "inform[] the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background" and therefore did not provide the jury with "a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision."[79]

The Texas legislature responded to *Penry I* in 1991 by enacting a new special-issues scheme.  In all cases in which a defendant is on trial for a capital offense committed on or after September 1, 1991, the jury must answer two[80] special issues: the same future-dangerousness issue from the old sentencing scheme, which is now codified at § 2(b)(1), and a new mitigation special issue. The mitigation special issue, codified at § 2(e)(1), asks the jury "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  Under § 2(f)(4), the court must instruct the jury that, in answering the mitigation special issue, it "shall consider mitigating evidence to

---

[77] *See id.* § 3(b)(2) (asking "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

[78] *See id.* § 3(b)(3) (asking, "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased").

[79] *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) ("*Penry I*"), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

[80] In cases in which the defendant was convicted under the law of parties, the jury is also required to answer a third special issue, which asks whether the defendant actually caused the death, intended to cause a death, or anticipated a death.  *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(2).

be evidence that a juror might regard as reducing the defendant's moral blameworthiness."

Although this new special-issues scheme has now been on the books for nearly twenty years, it has yet to make its way to the Supreme Court. Because of the slow pace at which capital cases proceed through the courts, the rather substantial body of recent Supreme Court precedent sustaining constitutional challenges to Texas's use of the special issues has little bearing on this case. Those decisions considered either the described pre-1991 scheme or the pre-1991 scheme in conjunction with the infamous "nullification" instruction. In fact, the Supreme Court commented favorably on the § 2(e)(1) mitigation special issue—albeit in dicta—in *Penry II*, commending the "brevity and clarity of this instruction" and suggesting that such a "clearly drafted catchall instruction on mitigating evidence" likely would "have complied with *Penry I*."[81]

Blue nonetheless contends that there is a reasonable likelihood that the jurors in his case interpreted the new special issues as prohibiting them from giving full consideration and effect to all of the mitigating evidence that he presented during his punishment-phase trial.[82] Blue acknowledges that "the language in the Texas mitigation issue itself," i.e., §2(e)(1), is constitutionally adequate.[83] But he argues that § 2(f)(4)'s definition of mitigating evidence as evidence that a juror might regard as reducing the defendant's moral blameworthiness is unconstitutionally narrow and "effectively nullifies the word 'background' in the special issue itself."[84] According to Blue, many reasonable,

---

[81] *Penry v. Johnson*, 532 U.S. 782, 803 (2001) ("*Penry II*").

[82] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 21–22.

[83] *Id.* at 28 (citing *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978)).

[84] *Id.* at 31.

law-abiding jurors "will assume that the phrase 'moral blameworthiness' relates only to those factors that are directly related to the commission of the crime, but not to the perhaps more remote socio-economic and psychological reasons why the defendant may have been predisposed to commit it."[85]  Thus, he concludes, the evidence he presented of his "poor mental health, low IQ, and good conduct while incarcerated" were effectively put beyond the reach of the jury.[86]

This Court considered and rejected this very line of argument in *Beazley v. Johnson*,[87] where it held that the capital sentencing scheme presently codified in article 37.071 "does *not* unconstitutionally 'preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"[88]  This Court concluded that "*all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in" § 2(e)(1)[89] and that § 2(f)(4)'s "definition of mitigation evidence does *not* limit the evidence considered under" § 2(e)(1).[90]  On this latter point, the *Beazley* court stressed that "'[v]irtually *any* mitigating evidence is capable of being viewed as

---

[85] *Id.* at 30–31.

[86] *Id.* at 31.

[87] *See* 242 F.3d 248, 259 (5th Cir.) ("Beazley maintained on direct appeal that the Texas statute's definition of 'mitigating evidence' is facially unconstitutional because it limits 'mitigation' to factors that render a capital defendant less morally 'blameworthy' for commission of the capital murder."), *cert. denied sub nom. Beazley v. Cockrell*, 534 U.S. 945 (2001).

[88] *Id.* at 260 (quoting *Lockett*, 438 U.S. at 604).

[89] *Id.* (citing *Prytash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999) (en banc), *cert. denied*, 529 U.S. 1840 (2000); *Cantu v. State*, 939 S.W.2d 627, 648–49 (Tex. Crim. App.) (en banc), *cert. denied*, 522 U.S. 994 (1997)).

[90] *Id.*

25

having some bearing on the defendant's 'moral culpability.'"[91]  Over the last ten years, this Court has reaffirmed its holding in *Beazley* in at least four unpublished decisions.[92]

*Beazley* forecloses Blue's claim for relief in two ways.  First, its conclusion that the new special-issue scheme is constitutional is very strong evidence that it was reasonable for the CCA to reach the same conclusion.[93]  Second, *Beazley* also held, on facts materially indistinguishable from those presented here, that the petitioner was not entitled to the issuance of a COA.[94]  That holding binds this panel and compels rejection of Blue's claim.[95]  Therefore, jurists of reason would not debate the district court's determination that the CCA's rejection of Blue's *Penry* claim is entitled to deference under § 2254(d)(1).

Blue advances several counter-arguments, but none can overcome the binding authority of *Beazley*.  First, he contends that *Beazley* is no longer good

---

[91] *Id.* (quoting *Graham v. Collins*, 506 U.S. 461, 476 (1993)).

[92] *See Cantu v. Quarterman*, 341 F. App'x 55, 60–61 (5th Cir. 2009) (per curiam) (unpublished), *cert. denied*, 130 S. Ct. 2102 (2010); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (unpublished); *Jackson v. Dretke*, 181 F. App'x 400, 412–13 (5th Cir. 2006) (unpublished); *O'Brien v. Dretke*, 156 F. App'x 724, 735–36 (5th Cir. 2005) (per curiam) (unpublished), *cert. denied*, 547 U.S. 1180 (2006).

[93] *See Jackson*, 181 F. App'x at 413 ("Where . . . a state court reaches a conclusion consistent with this circuit's precedent, it presumptively falls within the broad discretion afforded the state court under § 2254(d)(1), because we presumably would consider our own case law as within 'the range of reasonable judgment' afforded by Supreme Court decisions." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

[94] *See Beazley*, 242 F.3d at 255.

[95] Blue suggests that his is an as-applied challenge, not a facial challenge, *see* Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 20–21 & n.3, but *Beazley*'s categorical holding that "*all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in" § 2(e)(1), 242 F.3d at 260, elides the significance of this distinction.

law in light of the later-in-time en banc decision in *Nelson*.[96]  However, the

petitioner in *Nelson* was sentenced under the pre-1991 special issues scheme,

which did not include the mitigation special issue.[97]  *Nelson* holds only that the

future-dangerousness special issue does not, by itself, enable the jury to give full

effect to certain kinds of mitigating evidence, including mental illness.[98]  *Nelson*

did not overturn *Beazley*'s holding that the mitigation special issue allows the

jury to give full effect to any and all forms of mitigating evidence.[99]

Next, Blue argues that the Supreme Court's decision in *Skipper v. South

Carolina*[100] establishes that mitigation evidence extends beyond evidence that

tends to reduce the defendant's moral culpability or blameworthiness.[101]  In

actuality, *Skipper* holds that a defendant must be allowed to put on evidence of

his good conduct in prison as mitigation evidence at a punishment-phase trial.[102]

A few years later, in *Franklin v. Lynaugh*, the Court held that when a Texas

capital defendant puts on such evidence, the future-dangerousness special issue

gives the jury an adequate vehicle for considering it.[103]  Thus, it is beyond dispute

---

[96] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 29 & 31–33.

[97] *See Nelson v. Quarterman*, 472 F.3d 287, 290 & n.1 (5th Cir. 2006) (en banc), *cert. denied*, 551 U.S. 1141 (2007).

[98] *See id.* at 307–09.

[99] For the same reason, Blue's argument that "his low IQ could not be adequately considered under the future dangerousness issue alone," Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 34, is a non-starter.

[100] 476 U.S. 1 (1986).

[101] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 32 & 34.

[102] *See* 476 U.S. at 4–5.

[103] *See* 487 U.S. 164, 178 (1988) (plurality opinion); *id.* at 185–86 (O'Connor, J., concurring in the judgment); *see also Nelson*, 472 F.3d at 295.

that Blue's jury was instructed in a manner that enabled them to consider the mitigating effect of his good conduct in prison. And nothing in *Skipper* lends any support to Blue's broader contention that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness.

Third, Blue points to the fact that in some capital trials Texas courts have chosen to supplement the statutorily mandated jury instructions and offer broader definitions of mitigating evidence.[104] Be that as it may, Blue has not identified any authority that holds that the absence of such a supplemental instruction renders Texas's amended special-issues scheme constitutionally infirm. *Beazley*'s conclusion that § 2(e)(1) "'solves any potential narrowing problem in section 2(f)(4)'" because "'the trial court's instructions pursuant to [§ 2(e)(1)] provide the jury with a vehicle to respond to a broader range of mitigating evidence'" is squarely to the contrary.[105]

In sum, Blue cannot show that the special issues did not allow the jury to give full consideration and effect to evidence of his good conduct in prison, mental-health issues, and low IQ. *Franklin v. Lynaugh* holds that the special-dangerousness issue allows the jury to consider good conduct in prison, and *Beazley* holds that the mitigation special-issue enables consideration of the evidence of mental illness and low IQ. Jurists of reason would not debate the

---

[104] *See* Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 34–35 & 37–38. For example, in *O'Brien*, "the judge instructed the jury that '[a] mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case.'" *O'Brien v. Dretke*, 156 F. App'x 724, 736 (5th Cir. 2005) (per curiam) (unpublished), *cert. denied*, 547 U.S. 1180 (2006).

[105] *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.) (quoting *Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999)), *cert. denied sub nom. Beazley v. Cockrell*, 534 U.S. 945 (2001).

district court's decision to dismiss Blue's *Penry* challenge.  Accordingly, we deny Blue's motion for a COA on this claim.

## B.

Blue also contends that the failure to assign either party the burden of proof on the mitigation special issue violates the Due Process Clause. Specifically, Blue argues that "the failure to assign a burden of proof . . . fails to guide the discretion of the jury in a way that minimizes bias, arbitrariness and caprice in capital sentencing."[106]  Blue exhausted this claim by raising it as point of error number thirty-four in his direct appeal from the re-sentencing, and the CCA rejected it on its merits.[107]  As Blue concedes,[108] this Court has held on several occasions that "'[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.'"[109] The absence of controlling Supreme Court precedent is fatal to Blue's claim under § 2254(d)(1).

On a closely related but conceptually distinct note, Blue briefly argues that the failure to assign a burden of proof runs afoul of the Sixth Amendment's requirement that each element of a criminal offense must be proven beyond a reasonable doubt.[110]  This argument "ignores the distinction . . . between facts in

---

[106] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 46.

[107] *See Blue v. State*, 125 S.W.3d 491, 500–01 (Tex. Crim. App. 2003).

[108] *See* Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 46.

[109] *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011) (alteration in original) (quoting *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005)); *see also  Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir.), *cert. denied*, 130 S. Ct. 536 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 541–42 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

[110] Request for the Issuance of a COA and Supporting Brief, *supra* note 21, at 45.

aggravation of punishment and facts in mitigation."[111]  As this Court explained in *Granados v. Quarterman*, "not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt" is perfectly consistent with *Ring* and *Apprendi* because "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."[112]  Blue does attempt to distinguish these cases or otherwise suggest that they do not control.

Because both of Blue's arguments with respect to the burden of proof on the mitigation special issue are foreclosed by Fifth Circuit precedent, the correctness of the district court's decision to reject them is not subject to debate among jurists of reason.[113]  Therefore, we conclude that Blue is not entitled to a COA on this issue.

## C.

Finally, Blue contends that Texas's system of instructing punishment-phase jurors on the consequences of a failure to agree on a sentence violates the Eighth Amendment.  Article 37.071 requires capital jurors to be instructed that they can answer "Yes" to the future-dangerousness special issue and "No" to the mitigation special issue only if all twelve of them agree to do so and that they can give the opposite answers only if ten or more of them agree to do so.[114]  If the jurors answer "No" to the future-dangerousness issue or "Yes" to the mitigation

---

[111] *Apprendi v. New Jersey*, 530 U.S. 466, 490 n.16 (2000).

[112] 455 F.3d 529, 536–37 (5th Cir.), *cert. denied*, 549 U.S. 1081 (2006); *see also Paredes v. Quarterman*, 574 F.3d 281, 292 (5th Cir. 2009) (per curiam); *Avila*, 560 F.3d at 315; *Ortiz v. Quarterman*, 504 F.3d 492, 504–05 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).

[113] *Accord Druery*, 647 F.3d at 546.

[114] TEX. CODE CRIM. PROC. art. 37.071 § 2(c)(2), (f)(2).

issue, the defendant is sentenced to life without parole.[115]  The same result obtains if the jurors fail to agree on an answer, but the statute prohibits the court and the parties from informing the jurors of the effect of their failure to agree.[116] "This is commonly known as the '10-12 Rule.'"[117] Citing *Romano v. Oklahoma*,[118] Blue contends that the 10-12 Rule is unconstitutional because it affirmatively misleads jurors about their role in the sentencing process.  Blue exhausted this claim by raising it as points of error numbers thirty-two and thirty-three on his direct appeal from the re-sentencing proceeding, and the CCA rejected it on its merits.[119]

In *Romano*, the Supreme Court explained that remarks by a prosecutor or the court affirmatively mislead the jury regarding its responsibility for the sentencing decision if "'the remarks . . . improperly describe[] the role assigned to the jury by local law.'"[120]  However, the Supreme Court held in *Jones v. United States* that "a failure to instruct the jury as to the consequences of deadlock" in no way affirmatively misleads the jury about its role in the sentencing process.[121] This Court has concluded that *Jones* insulates the 10-12 Rule from constitutional

---

[115] *Id.* § 2(g).

[116] *Id.* § 2(a)(1), (g).

[117] *Smith v. Cockrell*, 311 F.3d 661, 683 (5th Cir. 2002) (citing *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000)), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274, 283 (2004).

[118] 512 U.S. 1 (1994).

[119] *See Blue v. State*, 125 S.W.3d 491, 504–05 (Tex. Crim. App. 2003).

[120] *Romano*, 512 U.S. at 9 (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)).

[121] 527 U.S. 373, 381–82 (1999).

attack.[122]  And it has also held that the 10-12 Rule passes constitutional muster independently of the holding announced in *Jones*.[123]   Because no clearly established federal law invalidates the 10-12 Rule or calls its constitutionality into doubt, Blue is not entitled to a COA on this issue.

To the extent that Blue's challenge to the 10-12 Rule urges us to adopt a new rule of constitutional criminal procedure, it also is barred under *Teague*.[124] New rules of constitutional criminal procedure cannot be announced on federal habeas review unless one of two narrow exceptions applies.[125]   "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government," which is to say, when its "result was not *dictated* by precedent existing at the time the defendant's conviction became final."[126]   Blue maintains that *Teague* is not implicated because he seeks to enforce the rules of *Romano*,[127] *Penry I*,[128] *Jurek v. Texas*,[129] and *Gregg v.*

---

[122] *See Druery*, 647 F.3d at 544; *Alexander*, 211 F.3d at 897 n.5.

[123] *See Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir.) (citing *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)), *cert. denied*, 531 U.S. 849 (2000).  *See generally Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir.) (per curiam) (unpublished) (noting that the Supreme Court's holding in *Jones* does not address the argument that the 10-12 Rule "creates the risk that a juror would be misled" before rejecting that argument as meritless), *cert. denied*, 131 S. Ct. 424 (2010).

[124] *Teague v. Lane*, 489 U.S. 288 (1989).

[125] *Id.* at 306, 310. *Teague* was a plurality decision, but the rule it announced was subsequently adopted by a majority of the Court in *Penry I*.  *See Penry I*, 492 U.S. 302, 313–14 (1989).

[126] *Teague*, 489 U.S. at 301.

[127] 512 U.S.1 (1994)

[128] 492 U.S. 302.

[129] 428 U.S. 262 (1976).

*Georgia*.[130]     However, in *Webb v. Collins*, this Court held that a habeas petitioner's Eighth Amendment challenge to "the jury instructions given pursuant to article 37.071(2) of the Texas Code of Criminal Procedure" was barred by *Teague*.[131]     This Court has reaffirmed that holding in numerous published opinions.[132]     Blue does not attempt to distinguish these cases or otherwise suggest that they do not control.  Nor does he contend that either of the two exceptions to the *Teague* bar applies here.

## V.

The motion for a certificate of appealability is DENIED.

---

[130] 428 U.S. 153 (1976).

[131] 2 F.3d 93, 94–95 (5th Cir. 1993) (per curiam).

[132] *See Druery v. Thaler*, 647 F.3d 535, 542–45 (5th Cir. 2011); *Hughes v. Dretke*, 412 F.3d 582, 595 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Davis v. Scott*, 51 F.3d 457, 466 (5th Cir. 1995), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274, 283 (2004).